**UNITED STATES of America, Appellee,**

v.

**George H. VEST, Defendant, Appellant.**

**No. 86–2054.**

United States Court of Appeals,
First Circuit.

Heard Sept. 11, 1987.
Decided March 21, 1988.

Willie J. Davis, Boston, Mass., with whom Davis and Robinson, was on brief, for defendant, appellant.

* Of the Third Circuit, sitting by designation.

John F. De Pue, Dept. of Justice, Washington, D.C., with whom Mark E. Robinson, Dept. of Justice, and Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and BOWNES, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

George Vest appeals from conviction on two counts of making false declarations to a grand jury. 18 U.S.C. § 1623 (1982). Vest contends that the district court committed four reversible errors: 1) it refused to conduct an individual voir dire of prospective jurors; 2) it admitted into evidence "bad acts" evidence in alleged violation of Fed.R.Evid. 404(b); 3) it admitted into evidence prior consistent statements in alleged violation of the Fed.R.Evid. 801(d)(1)(B) exception to the hearsay rule; and 4) it denied Vest's motion for acquittal on one of the two counts. In addition, because the grand jury was presented with certain illegal evidence, Vest asks this court to exercise its supervisory powers and dismiss the indictment. We find that the district court did not commit reversible error, and we decline to exercise our supervisory powers to dismiss the indictment. The conviction is affirmed.

## I. FACTS

This case revolves around four men: George Vest, Frank Tarantino, Jesse Waters, and Herbert Davis. George Vest, defendant-appellant, was a Boston police detective. Frank Tarantino was also a Boston police detective, and at one time was George Vest's partner. Jesse Waters was a notorious resident of Roxbury, Boston, who traded in marijuana and bootleg liquor through a chain of variety stores. Herbert Davis, also a resident of Roxbury, was Waters's friend, business associate, and employee. He acted as "sort of a general manager" for Waters's illegal enterprises.

On July 17 and 19, 1985, Vest appeared before a federal grand jury investigating

allegations of corruption within the Boston Police Department. Vest testified pursuant to a grant of use immunity. During the course of his appearances, Vest was questioned about his relationship with Jesse Waters. The grand jury returned an indictment against Vest and Waters. This appeal concerns Vest's conviction on Counts II and IV of the indictment, which charge that two of Vest's responses were false declarations in violation of 18 U.S.C. § 1623 (1982).

The first allegedly false declaration (Count II) concerned Vest's involvement in a payoff scheme between Waters and Frank Tarantino. The indictment charged that the underscored statement in the following pair of questions and answers was a false declaration.

Q. Do you have any knowledge, sir, of a payment that was made by Mr. Waters to Mr. Tarrentino [sic] at any time or for any reason?

A. I have no knowledge but I heard it in the street.

Q. And you had no participation in the payment of monies by Waters to Tarrentino [sic]?

A. *No.*

The second declaration (Count IV) concerned payoffs from Waters to Vest himself. The indictment charged that the following underscored testimony was a false declaration.

Q. Have you ever received anything—I believe I asked you that the last time you were here in front of the Grand Jury—Have you ever received any money from Jesse Waters for any reason? And you said, "No." That's correct?

A. Yes, sir.

Q. Have you ever received anything else of value from Mr. Waters other than money?

A. No.

Q. You've never been given money from cash registers in any of Mr. Waters' stores that he owns; any of his variety stores?

A. *No, I haven't.*

To prove that the above statements were false, the government presented evidence that Vest had acted as a middleman in the bribery scheme between Tarantino and Waters (Count II) and that Vest had received certain payoffs from Waters (Count IV). Discussing the counts in reverse order, we summarize the evidence produced by the government during the 17–day jury trial.

### A. *Count IV*

Jesse Waters's payments to George Vest were part of a larger scheme involving several members of the Boston police force. Waters testified that the Roxbury community and numerous Boston police officers were well aware of the illegal commerce carried out in Waters's chain of variety stores. In corroboration, several witnesses testified that marijuana was sold over the counter at Waters's Warren Street store in Roxbury while police officers passively looked on. Waters explained that he was able to operate this illegal business because he paid "protection" money to the police. According to Waters, over a period of years he made regular payments to numerous Boston police officers in order to ensure police inaction. Waters testified that one of the officers to whom he regularly made payments was Vest. Likewise, Herbert Davis, Waters's partner and "manager," testified that he made payments to Vest in order to "keep in good."

Waters's payoffs were usually distributed from his store on Warren Street in Roxbury. When an officer entered the store to make a pickup, the officer was given a sum of money in a small paper bag. These bags were filled either from the cash register or from a bag (the "marijuana stash") located beneath the cash register.

### B. *Count II*

Waters's attempted bribery of Tarantino arose out of the disputed events of the night of May 16, 1983. On that evening, Jesse Waters shot detective Frank Tarantino. The following facts about the shooting are uncontested: On the evening of May 16, 1983, Tarantino and his partner (at that time, a detective other than George Vest) drove to Waters's store on Warren Street

in Roxbury. Tarantino was in plainclothes. He entered the store, jumped on the counter, and brandished his gun. Waters, sitting in the back of the store, opened fire with a pistol, and shot Tarantino twice. Waters was subsequently charged by the Commonwealth of Massachusetts with, inter alia, assault with intent to murder and assault and battery by means of a dangerous weapon. In addition, Tarantino brought a $1.5 million civil suit against Waters.

Waters's pending criminal prosecution led to the Waters–Tarantino bribery scheme. Waters testified that after he was charged for the shooting, several police officers, including George Vest, approached him and stated that he and Tarantino should smooth over their relationship. Out of context, the idea of police officers negotiating with someone who had shot a fellow officer seems bizarre. However, Waters explained that he was well acquainted with several police officers—those whom he had paid off—and that these officers knew that the shooting was accidental. As Waters tells it, he thought the man who jumped on the counter was a stick-up man, not Detective Tarantino. If Waters had recognized Tarantino, Waters would never have shot him. Waters had nothing to fear from the police in general, and Tarantino, in fact, was an officer to whom Waters regularly gave payoffs. The police officers who approached Waters had also received payoffs and were well aware of the context. Given Waters's extensive involvement in police corruption, it can be inferred the officers feared that if Waters were convicted for the shooting, he might incriminate all of the officers in an attempt to receive a reduced sentence.

Waters was in favor of reaching some agreement with Tarantino. He believed that he could make a payment to Tarantino and that this payment would prevent him from having to go to trial over the shooting. Of the officers who approached him, Waters chose Vest to help him "work it out" with Tarantino. Vest proceeded to arrange two face-to-face meetings between Waters and Tarantino.

At the second such meeting, Waters and Tarantino entered into an agreement. Waters promised Tarantino $200,000 as settlement for the civil suit, and an additional $100,000 under the table so that Tarantino would not have to share this sum with his attorney. In return for the payments, Tarantino would fix Waters's criminal suit so that Waters would not even receive probation or a suspended sentence; a fine was the heaviest punishment Waters would receive for shooting Tarantino. Waters did not explain just how he thought Tarantino could affect the outcome of the criminal prosecution for attempted murder. He mainly relied on his belief that his lawyer and Tarantino's lawyer could "work it out" with the District Attorney's office. He also believed that Tarantino's attorney might have some special influence with the District Attorney because Tarantino's attorney's father was a police captain.

Vest had a role in the agreement—he was the middleman who would transfer the under-the-table payments from Waters to Tarantino. Vest denied this role before the grand jury, and this denial is the subject of Count II of the indictment.

During the summer of 1984, Waters paid about half of the promised $300,000. All of the under-the-table money was paid. In his role as a middleman, Vest delivered $50,000 in three installments to Tarantino. The final $50,000 was delivered by Waters directly to Tarantino. Waters also gave about $50,000 of the over-the-table money to Tarantino's attorney.

The second of the three payments for which George Vest acted as middleman is of particular importance in this appeal. On June 15, 1984, Vest picked up $35,000 from Waters for delivery to Tarantino. This payment has special significance for two reasons. First, Waters managed to obtain a "receipt" for the payment. Unbeknownst to Vest, Waters tape-recorded the conversation wherein he gave Vest the $35,000 for delivery to Tarantino. This tape was Waters's insurance; he knew it was the one incontrovertible piece of evidence that he could hold over the heads of Tarantino and Vest to enforce the deal.

Second, Herbert Davis (Waters's friend and partner) was involved with this payment, and was thus able to further corroborate the terms of the deal. Davis was the source of the $35,000, and he had discussions with Waters concerning the payment immediately before and after Vest made the pickup.

In the fall of 1984, the deal began to sour. Waters stated that he realized all was not going according to plan when, despite his substantial outlays, the District Attorney continued to pursue the prosecution.

Waters went to trial in October 1984. When the prosecution called Tarantino to the stand, Waters realized he had almost surely been betrayed. Tarantino testified that when he jumped on the counter in Waters's store, he had shouted "Police" and had displayed his badge. This testimony undercut Waters's defense that he thought the man who jumped on the counter was attempting to hold up the store. Perhaps in reaction to this testimony, during the course of the trial Waters tried to recover the $50,000 he had given to Tarantino's attorney. Waters was convicted on the lesser charge of assault and battery by means of a dangerous weapon.

After his conviction and before sentencing, Waters was held in custody by the Commonwealth. Waters phoned Tarantino, but Tarantino refused to speak with him, and he told Waters to relay any message through George Vest. Subsequently, Herbert Davis, Waters's friend and "general manager," visited Waters in state prison. At this meeting, Waters instructed Davis to speak with Vest. Waters conveyed to Vest, and thus indirectly to Tarantino, that if the deal were not carried out, Waters would tell federal authorities about the payoff scheme. He further threatened that federal authorities would be given the tape recording, which Waters viewed as irrefutable corroborative evidence.[1] Before hearing a response from Vest or Tarantino, Waters did in fact go to federal

authorities. He told them about the payoffs for protection and about the scheme with Tarantino, and he handed over the tape as well. After Waters began his cooperation, the Massachusetts court sentenced Waters to an eight-to-ten-year prison term for shooting Tarantino.

### C. *Procedural History*

Waters's cooperation with federal authorities led to the grand jury investigation which resulted in Vest's indictment. When Vest was called before the grand jury, he made the two allegedly false declarations detailed above. In addition, the existence of the tape led to a third false declaration count. After Vest had denied a role in the Waters–Tarantino payoff scheme, *see* Section B (Count II), *supra*, the prosecutor played the tape to the grand jury. In response to questioning, Vest denied that his voice was present on the tape. The grand jury returned a four-count indictment comprised of charges against both Waters and Vest. Count I charged Waters with the attempted bribery of Tarantino. The remaining counts charged Vest with making three false declarations: the two statements at issue in this appeal (Counts II and IV), and Vest's allegedly false statement that his voice did not appear on the tape (Count III).

Before trial, Vest moved to exclude the tape from evidence because the tape was made in violation of federal law, *see* 18 U.S.C. § 2511(2)(d) (1982), and was thus inadmissible evidence, *see id.* § 2515. Vest also moved to dismiss the indictment because the same federal statute prohibits the presentation of illegal recordings to grand juries. *Id.* The district court excluded the evidence, *United States v. Vest,* 639 F.Supp. 899 (D.Mass.1986), but did not at that time rule on Vest's motion to dismiss the indictment. This court subsequently upheld the district court's exclusion of the tape. *United States v. Vest* (*"Vest I"*), 813 F.2d 477 (1st Cir.1987).

---

**1.** At trial, Waters did not use the word "tape," but referred to it only as "evidence." Since the tape was excluded, *see United States v. Vest,* 813

F.2d 477 (1st Cir.1987), the district court kept all knowledge of the tape's existence from the jury.

The government moved to sever the count relating to the tape (Count III) so that the case could proceed to trial on the remaining two counts while the appeal from the evidentiary ruling was pending. The district court granted the motion, and the trial began in September 1986. At trial, the government's chief witness was Jesse Waters, who testified for nearly four days. Waters's testimony, if credited by the jury, was sufficient to support a finding that Vest had in fact acted as a middleman in the Waters–Tarantino scheme and that Vest had received payments from Waters's cash registers. The remainder of the government's case can be characterized as corroboration for Waters's four days of testimony. After the jury had entered a guilty verdict on both counts, the district court denied Vest's motion to dismiss the indictment.

## II. RULE 404(b) EVIDENCE

Vest claims that the trial court erred when it allowed two witnesses—Herbert Davis and Leopold Thompson—to testify that they had made payments to Vest.[2] This testimony, Vest argues, was admitted in violation of Fed.R.Evid. 404(b), which provides that,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Vest also argues that even if this evidence complied with Rule 404(b), it was inadmissible under Rule 403 because the prejudice from the evidence outweighed its probative value.

We turn first to the procedural history of these evidentiary challenges. In April 1986, five months before the trial began, Vest moved *in limine* to exclude certain other-bad-acts evidence he anticipated the government might use at trial. One bad

act mentioned in the motion—that Vest had "received sums of money from Roxbury residents for use in purchasing a new Cadillac"—overlaps with the evidence now challenged. At trial, the persons who testified to this effect were the same persons (Herbert Davis and Leopold Thompson) whose testimony Vest challenges in this appeal.

Just before impanelling the jury, the district court considered Vest's motion to exclude *in limine.* The district court declined to rule on the motion before any evidence had been presented. It explained that once the trial had proceeded, it would have the necessary factual context for deciding whether the proffered evidence complied with Rule 404(b) and whether it passed the balancing test mandated by Rule 403.

On the tenth day of trial, Herbert Davis took the stand. When the prosecutor informed the court that he wished to question Davis about payments to Vest, Vest's counsel objected. The district court then ordered an examination of Davis outside the presence of the jury. In that voir dire, Davis stated that he had given five or six payments to Vest over a two-year period. He remembered one specific payment where, in the presence of Leopold Thompson, he gave Vest $200 toward the purchase of a new Cadillac. Davis explained that the purpose of these payments was "to keep in good." After a colloquy with counsel, the district court indicated that the issue of allowing Davis's testimony was of "sufficient importance" that the court would give the parties an opportunity to point out any relevant authority. Consequently, the court stated that it would decide the question the following day, after examining the submissions of the parties.

The following morning, after hearing argument, the district court ruled it would admit Davis's testimony of payments to Vest. The court's ruling came after the prosecutor had advanced four reasons for

---

**2.** Vest's brief says that "several" witnesses were allowed to testify in this manner. However, the brief only cites to the testimony of two witnesses, Davis and Thompson, and we have found no others.

admissibility.[3] First, the prosecutor had argued that Davis's testimony of other pay-offs to Vest was probative of Vest's motive to lie before the grand jury. The district court rejected this argument. The court thought that Vest's motive to lie to the grand jury concerning his involvement in the illicit payoff schemes was so over-whelmingly self-evident that there was no need to accept evidence of other bad acts that might have produced a similar motive.

The district court's stated reason for ad-mitting Davis's testimony was that Davis's testimony was relevant to Vest's "motive, plan, design, [and] method of operation in relation to the underlying conduct." The prosecutor's second and third arguments were germane to that theory.

The prosecution's second argument was that Davis's payments to Vest were proba-tive of Vest's receipt of protection pay-ments in Waters's variety stores. Count IV, it will be remembered, charged that Vest had lied when he denied having been given "money from cash registers in any of Mr. Waters' stores that he owns; any of his variety stores." As Davis was inti-mately involved with Waters in the mari-juana sales and other activities carried on at Waters's variety stores, Davis's own payments to Vest—paralleling those of Wa-ters—to "keep in good" with the police, were added proof that Vest was involved in a common scheme to provide police protec-tion for the wrongdoing at Waters's stores. As we discuss below, this is a proper "oth-er purpose" under Rule 404(b) for the ad-mission of "other crimes" evidence.

The prosecution's third theory of admis-sibility built on the second theory to show the relevance of Davis's testimony with regard to Count II (Vest's denial of involve-ment in the Waters–Tarantino payoff scheme). The prosecution argued that as payoffs by Davis to Vest could be imputed also to Waters, they tended to show Vest's motive in becoming involved in the scheme to fix Waters's criminal trial for the shoot-ing of Tarantino. The government theo-rized that Vest feared that Waters, if con-victed of shooting Tarantino, would turn state's evidence regarding the entire scheme of police corruption, including the payoffs to Vest. The payments from *Davis* to Vest are relevant because of Davis's close identification with Waters, making them generally probative on wheth-er Vest received payoffs from Waters. Since we find the second theory of admissi-bility dispositive, we need not decide wheth-er this further theory suffices to support the admission of Davis's testimony of other bad acts.

The prosecutor's fourth argument was that Davis's other bad act testimony was admissible to corroborate the testimony of Waters. The district court did not refer to this fourth argument in ruling that the evidence complied with Rule 404(b). How-ever, in performing the balancing required by Rule 403, the district court did consider the corroborative effect of Davis's testimo-ny in supporting the credibility of Waters's testimony.

■ We now detour briefly to consider the second "other acts" witness, Leopold Thompson, who following another witness was called to the stand later in the same day that Davis testified. Thompson testi-fied, without objection, that he had given payments to Vest "a few times," and that these payments totalled about $1,000. Thompson also remembered a specific inci-dent when Davis was present and Thomp-son gave Vest $100. Although Thompson did not recall whether Davis also gave a payment to Vest, nor whether the payment was for the purchase of Vest's new Cad-illac, the testimony created an inference that this was the same incident as that in which Davis gave Vest $200 for the new Cadillac. While Thompson's evidence had been covered by Vest's earlier motion to exclude *in limine*, the absence of any ob-jection when Thompson testified is fatal to Vest's present argument that Thompson's testimony should have been excluded. *See* Fed.R.Evid. 103(a)(1). We accordingly find

---

**3.** The prosecutor's arguments were presented more informally. We have organized them for ease of discussion.

no reversible error in the receipt of Thompson's testimony.[4]

In so ruling, we reject any argument that Vest's objection and the district court's ruling on the admissibility of *Davis's* other bad acts testimony carried over to Thompson's testimony. When Davis took the stand, the admissibility of his testimony concerning payoffs to Vest was discussed solely in terms of his own conduct. A separate objection was necessary when, following another witness, Thompson took the stand. Although the court had earlier allowed *Davis* to testify about his payoffs to Vest, its ruling followed the prosecutor's heavy emphasis on the strong ties between Davis and Waters's illegal enterprises, indicating a common "plan, design, [and] method of operation" whereby Vest received protection payments from Waters *and* Davis—both of whom jointly carried on the illegal activities at Waters's stores. As Thompson had no similar relationship to Waters, Vest cannot claim that the ruling admitting Davis's bad acts testimony necessarily foreshadowed a similar ruling as to Thompson's bad acts testimony. The purpose of requiring an objection is to call a disputed matter to the district court's attention, enabling it to make a proper ruling, and thus avoiding a needless appeal. In this case, the district court was not given that opportunity, and Vest cannot now reap the benefit of arguments never timely put to the lower court.[5]

■ We return now to the district court's ruling admitting Davis's testimony

of payments to Vest. A timely objection had been lodged to Davis's so testifying, but, as we have indicated, the district court properly overruled it. We now discuss our reasons for so concluding at greater length.

The procedure for examining the admissibility of other bad acts testimony is well established in this circuit.

> As a first step, the judge determines whether the evidence has some special probative value that would show intent, preparation, knowledge, or absence of mistake. As a second step, the judge balances the evidence's probative value against the prejudice to the defendant. The balancing is committed to the district court's discretion, and will be reversed only for an abuse of discretion.

*United States v. Scelzo*, 810 F.2d 2, 4 (1st Cir.1987) (citing *United States v. Kadouh*, 768 F.2d 20, 21 (1st Cir.1985)). The district court here followed this two-step analysis. Although the district court did not fully explain the "special purpose" for Davis's testimony, the court's reasoning is not difficult to reconstruct. The special purpose for allowing Davis to testify that he paid off Vest was to show that Vest was involved in an ongoing scheme to provide protection for Waters's illegal enterprises—enterprises managed by Davis in conjunction with Waters himself.

For the government to prove that the declaration in Count IV was false, it had to prove that Vest had received payments

---

**4.** We do not find that the admission of Thompson's other bad act testimony resulted in "plain error" under Fed.R.Crim.P. 52(b). "[W]hen addressing plain error, a reviewing court cannot evaluate a case except by viewing such a claim against the entire record." *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Our review of the record reveals that the evidence was more than sufficient to support the jury's verdict. *See United States v. Munson*, 819 F.2d 337, 341 (1st Cir.1987); *United States v. Martin*, 694 F.2d 885, 889 (1st Cir. 1982). Moreover, in the context of a 17–day trial with a score of witnesses, we do not find Thompson's brief testimony that he gave payments to Vest to have infected the trial with prejudice. In short, Thompson's testimony of other bad acts, when "[v]iewed in context, were not such as to undermine the fundamental fair-

ness of the trial and contribute to a miscarriage of justice." *Young*, 470 U.S. at 16, 105 S.Ct. at 1047.

**5.** Our holding is based on the district court's stated determination at the time the motion *in limine* was presented *not* to rule on the admissibility of the evidence until the government had actually offered it. When, in response to a motion to exclude *in limine*, a district court rules that the contested evidence *is* admissible, two circuits have held that no contemporaneous objection is required to preserve the issue on appeal. *See Palmerin v. City of Riverside*, 794 F.2d 1409 (9th Cir.1986); *American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321 (3d Cir.1985). *But see Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir.1980).

from the registers in Waters's stores. The government's theory was that Waters and various members of the Boston police, including Vest, were members of an ongoing conspiracy wherein Waters made regular payments for "protection." The protection was chiefly for illegal sales of marijuana occurring regularly in Waters's stores under the very eyes of the police. Under the Federal Rules of Evidence, the government is entitled to offer evidence tending to show that Vest was a member of such a conspiracy, and that Vest's declaration was thus more likely to be false. *See* Fed.R. Evid. 401, 402. As the prosecutor argued, the fact that Davis, who was Waters's close associate in this illegal enterprise, also made payments to Vest "to keep in good" is probative of whether such a conspiracy existed and whether Vest was a member of the conspiracy. *Cf. United States v. Rohrer,* 708 F.2d 429, 435 (9th Cir.1983) (noting that other bad acts may be admitted "to show material facts relating to the conspiracy and that the conspiracy was continuing along the same lines" (citation omitted)). This use of the evidence is different from attempting to link Vest with the charged crime merely by showing he took payoff bribes generally. Courts often describe this type of evidence admissible under Rule 404(b) as proof of a "common scheme or plan." *United States v. Burkley,* 591 F.2d 903, 920 (D.C.Cir. 1978) (citation omitted), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979); Fed.R.Evid. 404(b) (evidence of other crimes, wrongs, or acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, *plan,* knowledge, identity, or absence of mistake or accident." (emphasis added)). *See also United States v. O'Connor,* 580 F.2d 38, 41 (2d Cir.1978) ("The second subcategory of common plan in-

volves similar act testimony constituting a continuing scheme or conspiracy."); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[16](2) (1986) (citing cases).[6]

The district court did not abuse its discretion in finding that the probative value of Davis's testimony outweighed its prejudicial effect. The district court found that Davis's testimony was highly probative because it corroborated Waters's testimony. The court explained that to a large degree the case centered on the credibility of Waters and the story he told. The court also noted that Vest planned to call several witnesses to undermine the credibility of Waters. Thus testimony which tended to corroborate Waters's testimony was an important element of the government's case.

To be sure, for a jury to hear that Vest took money from Davis, an admitted drug dealer, could have led them to believe that Vest had a bad character and was disposed toward corruption. We cannot say, however, that this evidence was admitted in violation of Rule 403. First, Waters's credibility was of particular importance in this trial, giving the government a strong need for corroborative evidence. Necessity can be an important element of Rule 403 balancing. *See* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[18]. *See also* Fed.R.Evid. 403, Notes of Advisory Committee on Proposed Rules ("Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission."). Second, the district court limited the prejudicial effect of the evidence by issuing the appropriate limiting instruction. Finally, balancing is primarily left to the district court. In close cases such as this we defer to the decision of the district court.

**6.** Vest argues that Davis's testimony is not admissible because the bad acts to which Davis testified (receipt of payoffs) were not sufficiently similar to the crime charged in the indictment (perjury). This argument fundamentally misconstrues Fed.R.Evid. 404(b). Although similarity between the crime charged and the bad acts evidence may be pertinent to Rule 404(b) analysis in certain cases, *see, e.g., Scelzo,*

810 F.2d at 4–5, "similarity" is not a general requirement for admissibility under Rule 404(b). As this court has stated many times, the important question is whether the evidence of other crimes, wrongs or acts is admitted for some "special purpose" other than to prove that the defendant was of bad character and acted in conformity therewith. *See, e.g., id.* at 4.

In stating that Davis's testimony was needed to support the testimony of Waters, we do not mean to suggest that testimony that merely supports the credibility of another witness is exempt from the prohibition against character evidence set forth in Fed.R.Evid. 404. The important question is exactly what Waters said that Davis's testimony corroborated. If Waters's testimony were simply that "Vest is a corrupt cop," corroboration of such testimony would be inadmissible character evidence. *See United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir.1978) ("The government has failed to demonstrate how the challenged testimony corroborated any consequential testimony except insofar as it tended to show that appellant was a bad man likely to have committed the crimes charged in the indictment—a clearly impermissible use.").

On the other hand, given Waters's testimony that he regularly made payments to Vest for police protection relative to the illegal sale of marijuana and other contraband at his variety stores, the testimony of his manager and confederate, Davis, of other acts corroborating the existence of that payoff conspiracy, was admissible. Whether one labels the purpose of Davis's testimony as corroboration of Waters's testimony that Vest took money from Waters's registers, or as direct evidence that Vest was involved in a payoff scheme with Waters's enterprises, is of no import. In either case, the evidence is relevant to whether Vest took money from the registers, and it is offered for a purpose other than to prove Vest's bad character.

### III. PRIOR CONSISTENT STATEMENTS

■ Vest's second evidentiary challenge involves two instances where the court overruled hearsay-based objections on the ground that the disputed testimony consisted of "prior consistent statements." *See* Fed.R.Evid. 801(d)(1)(B); [7] *United States v. Patterson*, 644 F.2d 890, 899–900 (1st Cir.

1981). We hold that the district court did not err in allowing the statements into evidence.

Vest objects to testimony of Herbert Davis which restated what Waters had said around the time of the $35,000 payment. While Davis was describing his role in that payment, he recounted four conversations that he had had with Waters. Vest's counsel objected each time Davis testified to what Waters had said during the conversations. The court overruled the objections, indicating that Waters's remarks were "prior consistent statements" in relation to Waters's testimony at trial. Vest disputes these rulings.

First, Vest claims that the statements of Waters to which Davis testified were not actually "consistent" with Waters's testimony at trial. Waters testified that,

1) Vest picked up a $10,000 payment from Waters. At that time, Waters arranged for Vest to make an additional pickup "in a couple of days."

2) Waters called Herbert Davis and asked him to "get up all the money he had and deliver it to me."

3) Davis delivered $35,000 in a brown paper bag to Waters's office on Crawford Street.

4) Waters put the bag away, while "waiting to carry out [his] appointment" with George Vest.

5) Vest came by at about 10:30 or 11:00 p.m. that night to make the pickup.

Davis's testimony, by comparison, was as follows. The portions of Davis's testimony allegedly inconsistent with Waters's testimony are emphasized.

1) Not applicable.

2) Davis met with Waters, and Waters said "get as much money as I [Davis] can get together as soon as possible."

3) Davis counted out $35,000 from his own funds. In the afternoon of the day in

---

7. Fed.R.Evid. 801(d) states,

A statement is not hearsay if—
  (1) Prior statement by witness.
  The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is.... (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

question, Davis delivered the funds to Waters at Waters's office on Crawford Street.

4) *Waters stated that, "He wanted me [Davis] to drop some money off to some people."* Davis declined to do so, explaining that he did not trust the police.

5) Davis returned to Waters's office between 10:00 and 11:00 p.m. that night. At that time Waters stated: *"I [Davis] didn't have to do it,* he [Waters] got somebody else to do it." Waters also explained that the "somebody else" was George Vest. Later that night (at 2:00 or 3:00 a.m.), Davis again met with Waters. Waters explained that things went "perfect," and that "It's all set." Waters further explained that as a result of the payment, he would not have to spend any time in jail.

As this comparison of Davis's and Waters's testimony shows, the testimony of the two witnesses was for the most part consistent. In particular, it was consistent with respect to a fact of central importance to the trial: that Vest transferred the $35,000 payment from Waters to Tarantino. Vest, however, stresses the one inconsistency: Waters testified that he had *prearranged* for Vest to deliver the $35,000, while Davis testified that Waters wanted *Davis* to transport the money. This difference, Vest argues, removes Davis's testimony from the ambit of a prior consistent statement under Fed.R.Evid. 801(d)(1)(B). We disagree.

First, the testimony is not necessarily inconsistent. Even though Waters had prearranged for Vest to deliver the $35,000, Waters may have hedged his bets by asking Davis if he too might make the delivery. Second, a prior consistent statement need not be identical in every detail to the declarant's (in this case, Waters's) testimony at trial, and Vest cites no authority to the contrary. Inevitably, witnesses' recollections of past events will diverge. Davis's recollection of Waters's prior state-

ment, and Waters's testimony at trial are sufficiently close to fall within Fed.R.Evid. 801(d)(1)(B). Vest was not without means of protection. For testimony to comply with Rule 801(d)(1)(B), the declarant must be available for cross-examination. The district court explicitly stated that Vest was entitled to recall Waters for further cross-examination. If Vest believed that the testimony was as inconsistent as he now claims, he could have recalled Waters and exposed the full extent of the inconsistency to the jury.

Vest's second objection is that the statement in question was outside the ambit of Fed.R.Evid. 801(d)(1)(B) because it was incapable of being used to "rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Appellant argues that the statement was made *after* Waters acquired his improper influence or motive. The district court held otherwise, and we accept its finding. This is a factual question to be determined by the trial court. Fed.R.Evid. 104(a). In such cases, we will only overturn the trial court if its finding is clearly erroneous. *See Patterson,* 644 F.2d at 894 (clearly erroneous standard for determining coconspirators under Fed.R.Evid. 801(d)(2)(E)). The evidence here more than sufficed to support the court's finding. In cross-examining Waters, the defense suggested that *after* the Waters–Tarantino deal broke down, Waters began to fabricate an elaborate story of police corruption, hoping that federal authorities, in return for Waters's cooperation, would intervene in his behalf. The prior consistent statement to Davis was made in the summer of 1984. At this time, the Waters–Tarantino deal was in full swing, and Waters did not yet have the "improper motive" to implicate police officers in the payoff scheme.[8] We conclude that Davis's testimony to Waters's prior statements was properly admit-

---

8. Vest's arguments to the contrary are entirely unconvincing. Appellant claims that the action of Waters in tape recording the transfer to Vest shows that Waters already had a motive to lie in June 1984. Appellant also refers to an incident wherein Waters told Davis that a payment in fact destined for Tarantino was instead to be used to pay off another officer. This falsification, Vest argues, again shows that Waters had an improper motive to lie *before* the deal broke down in late 1984. We fail to see how either incident shows that before late 1984 Waters had a motive falsely to implicate police officers in the payoff scheme.

ted: the statements were sufficiently consistent and were made before Waters acquired a motive to fabricate.

The second set of prior consistent statements to which Vest objects were made in a telephone call between Waters and Davis on July 25, 1985. This call was arranged by federal authorities after Waters had begun cooperating in full. The authorities had Waters call Davis and ask him about Davis's role in the payoff scheme. The authorities told Waters that the call was recorded, but Davis was unaware of that fact. At trial, a federal agent testified to what was said during the conversation.

■ Waters's statements during the phone call were not "prior consistent statements" under Fed.R.Evid. 801(d)(1)(B). They were made well after Waters began to cooperate, and thus after Waters acquired a motive to fabricate. However, what Waters said in the recorded conversation was not hearsay at all. As set forth in the margin, his statements were merely questions to Davis, and were not "offered . . . to prove the truth of the matter asserted." [9] Fed.R.Evid. 801(c).

■ Davis's responses, on the other hand, were admissible as prior consistent statements. Two requirements are easily met: Davis's motive was questioned on cross-examination, and the phone conversation was consistent with Davis's testimony at trial. The only issue is whether by the time of the phone call Davis had acquired a motive to lie. From the record before us, we do not find the district court's ruling to be clearly erroneous. The premise of the arranged phone call was that Davis would think that he was speaking privately to Waters, and thus that the government would obtain reliable corroboration of Waters's story. Unless someone had tipped off Davis to the true nature of the call, Davis lacked any motive to fabricate. We

sustain the lower court's admission of the evidence.

## IV. INSUFFICIENT EVIDENCE ON COUNT IV

Vest claims that as a matter of law the evidence was insufficient to support his conviction on Count IV.

■ The government correctly notes that Vest waived his motion for acquittal by failing to raise it at the completion of all the evidence. Although Vest had moved for acquittal at the close of the government's evidence, he then proceeded to introduce evidence in his own behalf and did not thereafter renew the motion. This omission served to waive the earlier motion. *See United States v. Notarantonio*, 758 F.2d 777, 788 (1st Cir.1985). In such circumstances, a conviction shall only be overturned upon a showing of "clear and gross injustice." *United States v. Greenleaf*, 692 F.2d 182, 185 (1st Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983). However, we find that the evidence was sufficient to support the jury's verdict even under the usual, more searching standard of review.

■ Count IV alleged that the following underlined response was a false declaration:

Q. You've never been given money from cash registers in any of Mr. Waters's stores that he owns; any of his variety stores?

A. *No, I haven't.*

The specific gap in the evidence claimed by Vest is that the government failed to prove that Vest *knew* the payoffs originated in the registers in Waters's stores.

In reviewing this claim of insufficient evidence, "we consider the evidence as a whole, taken in the light most favorable to

---

9. The following is an excerpt from the direct examination of the government agent who testified to the contents of the phone call:

Q. Were there any particular questions that Mr. Waters was asked to—or any particular thing Mr. Waters was asked to say to Mr. Davis during that consentually [sic] monitored conversation?

A. Yes, sir. Should—

Q. Yes. What was he—what was Mr. Waters supposed to say during that conversation? [OBJECTION—OVERRULED]

A. Mr. Waters was asked to ask Herbert Davis how much money he had given to him so that he could turn it over to Mr. Vest and then eventually to Mr. Tarantino.

the government, together with all legitimate inferences to be drawn therefrom...." *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984). Whether the defendant had knowledge of a certain fact, like whether a defendant had the intention to conspire, *see id.*, can rarely be proven by direct evidence, and this case is no exception. However, given the strong circumstantial evidence, the jury could reasonably have inferred that Vest knew the origin of the payoff money.

The relevant testimony is that of four witnesses—Jesse Waters and three of the cashiers who worked in Waters's Warren Street store. They stated that payoffs were made to police officers on a regular basis and that several procedures were employed. Vest was one of the regular pickup men—he received payoffs as often as once a week. Usually, the money was given to police officers in paper bags. If Waters planned to be out of the store when the police officers came by, he would leave a bag of money with the cashier. If Waters was in the store when the officer arrived, the officer and Waters would meet in the back of the store. If Waters did not have the payoff money in his pocket, he would go to the cashier's station located in the middle of the store. Then Waters would either ask the cashier to fill a bag of money or Waters would do it himself. The money was taken from either the register or from the "marijuana stash" which was kept underneath the register. Waters would then return to the back of the store and hand the bag to the waiting officer. This evidence is sufficient for the jury to find that Vest had in fact received money from the cash registers in Waters's stores.

The evidence also showed that the cash register was visible from the back of the store, which was the location where Waters would hand the payoff to the police officer. First, the testimony showed that Waters's Warren Street store was like one long, narrow room, with the cash register located in the middle. Second, two of the cashiers testified that they had observed Waters hand bags of money to police officers. Finally, Waters testified that on the night of the shooting, he was in the back of the store when he observed Tarantino jump up on the counter where the cash register was located. Vest's argument to the contrary relies on the fact that one cashier labeled the back of the store "a secluded place." However, the same witness was also able to observe Waters and Vest converse in this location. Apparently, the back of the store was "secluded" in relation to the front of the store, but it was visible from the cashier's station.

Given the evidence that the payoff money was taken from the register, that one could see the register from the back of the store, and that Waters regularly gave payoffs to Vest in the back of the store, the jury could reasonably have inferred that Vest had knowledge of the origin of the payoff money. Thus we find that the evidence is sufficient to support the verdict in Count IV, and that the conviction certainly does not approach a "clear and gross injustice."

## V. INDIVIDUAL VOIR DIRE

■ Before the trial, Vest moved for individual questioning of prospective jurors. Vest's counsel contended that the community was so saturated with adverse publicity that only this procedure would ensure a fair trial. The district court denied the motion, and Vest now claims this was reversible error. We disagree.

The method of conducting the voir dire is left to the sound discretion of the district court. Rejection of the judge's procedure on appeal is not warranted unless we find "circumstances which create an impermissible threat of an unfair trial." *Salemme v. Ristaino*, 587 F.2d 81, 88 (1st Cir.1978); *see also United States v. Perrotta*, 553 F.2d 247, 250 n. 6 (1st Cir.1977) ("We leave to the sound discretion of the district court whether its initial inquiry into exposure to pre-trial publicity should be to the jurors collectively, as permitted in *Margoles v.*

*United States*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), or individually."). We do not believe the circumstances here threatened an unfair trial. To the contrary, the procedure adopted by the district court struck a reasonable balance between ensuring a fair trial and avoiding needless delay.

The court can be said to have adopted a hybrid procedure of collective and individual questioning. It asked the prospective jurors, collectively, whether any of them had heard "anything at all" about the case. Any juror who responded affirmatively was called to the side bar for individual questioning by the judge. Jurors singled out were each asked to recount all that he or she knew about the case, and to state whether this knowledge would influence him or her in any way. The prosecutor and defense counsel were also given the opportunity to pose further questions to each such juror. In all, only four of 31 prospective jurors stated that they had some knowledge of the case. When questioned further, these four jurors all said that they would not be biased by their prior knowledge, and none of the four were challenged for cause.

In *United States v. Perrotta*, 553 F.2d at 250 n. 6, we approved a similar procedure. We see no inconsistency between what went on here and our decisions in *United States v. Rhodes*, 556 F.2d 599 (1st Cir. 1977), and *United States v. Patriarca*, 402 F.2d 314, 318 (1st Cir.1968), *cert. denied*, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). In both *Rhodes* and *Patriarca* the type of collective questioning conducted by the district court was significantly different. There the district court inquired of the jurors collectively whether any of them had been *prejudiced* by adverse publicity. The flaw in this procedure was that,

> The court's questioning in no way elicited what, if anything, the jurors had learned, but let the jurors decide for themselves the ultimate question whether what they had learned had prejudiced them, without

permitting the court to give any further instruction, or pursue further interrogation.... [T]his was altogether too telescopic an approach.

*Rhodes*, 556 F.2d at 601. In contrast, under the procedure approved in *Perrotta*, and employed by the district court here, jurors were not asked to decide for themselves the "ultimate question" of impartiality; once a juror admitted to any knowledge of the case, he or she was individually questioned as to the facts and extent of such knowledge.

Vest claims that the district court's procedure is flawed because jurors, in general, are reticent to call attention to themselves. Thus, Vest argues, jurors with some knowledge of the case may not have responded to the court's collective questions. Moreover, Vest claims that "the community was so saturated with prejudicial publicity" that individual questioning was warranted. In effect, Vest argues that more than four jurors must have had some knowledge of the case. To prove the degree of publicity, Vest quotes several newspaper headlines, as well as one of the four jurors with some knowledge of the case, who stated, "I do live in Boston, so I can't believe I'm the only one who read about this." In sum, Vest believes that this case is of the exceptional type referred to in *United States v. Perrotta*, where we said, "[T]here will undoubtedly be situations where individual inquiry will be the preferred course from the outset, just as in less sensitive situations collective inquiry will be more economical of time and less distracting." 553 F.2d at 250 n. 6.

The present case, however, did not reveal special circumstances from which it may be deduced that jurors with actual knowledge of the case might have been reluctant to come forward. That only four of 31 jurors professed to know anything about the case is suggestive less of a suspicious reticence than that fewer people knew of the case than appellant believes. If the community were really "saturated with prejudicial publicity," more than four prospective jurors

would likely have indicated that they had heard of the case. *Cf. Salemme v. Ristaino*, 587 F.2d at 88 (upholding the district court's decision not to conduct individual voir dire because, inter alia, only two of the jury panel recalled anything about the case). The evidence of publicity produced by Vest shows something less than a "saturation" of the community. Vest's case did make the front page of the *Boston Globe* on three occasions prior to trial, but the last front page story was over six weeks before the trial began. Furthermore, none of the four jurors who remembered the case and were individually questioned displayed more than a hazy recollection of the facts. Finally, we note that not one of the jurors mentioned any awareness of the one item of publicity (to which Vest has alerted us) that was seriously prejudicial. This item was the existence of the inculpatory tape which recorded the events surrounding Waters's handing of the $35,000 payment to Vest. Awareness of the existence of such a tape, which was excluded from evidence at trial, might have led a juror to think Vest guilty on the strength of evidence not presented at trial. *See, e.g., Rhodes*, 556 F.2d at 600 (overturning conviction for sale of marijuana because jurors may have read an article revealing that in an unlawful search, eight tons of marijuana were found on defendants' property). None of the questioned jurors, however, mentioned the tape.

In conclusion, we find that the district court's method of conducting the voir dire was within its discretion and proper.

## VI. ILLEGAL EVIDENCE BEFORE THE GRAND JURY

██ The tape of the conversation between Vest and Waters was played to the grand jury in violation of Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520 (1982 & Supp. III 1985). *See Vest I*, 813 F.2d at 477; 18 U.S.C. § 2515 (1982).[10] Vest presents two arguments why this unlawful act requires dismissal of the indictment: he was prejudiced because the grand jury would not have returned the indictment but for the illegal evidence, and the government's illegal conduct warrants the exercise of our supervisory powers to deter future misconduct.

The government contends that the first argument is foreclosed by *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), which held that the government's violation of Fed.R.Crim.P. 6 in grand jury proceedings was rendered harmless by the defendant's subsequent conviction by a petit jury. *See also United States v. Bucci*, 839 F.2d 825, 831 (1st Cir.1988) ("[W]e do not overlook *United States v. Mechanik*, which recognizes that at least some 'errors, defects, irregularities or variances' attending the grand jury proceeding may be rendered harmless by the verdict of the petit jury." (citation omitted)). However, we need not address this contention because Vest has failed to show that he was prejudiced before the grand jury by the prosecution's use of the illegal tape. The district court, in denying Vest's motion to dismiss the indictment, found that the indictment "was fully supported ... entirely apart from the suppressed tape." Vest has the burden of showing that the district court is in error. However, the grand jury minutes are not part of the record on appeal, and thus Vest has presented no basis on which we can even begin to consider whether the district court erred. *See Cruz–Sanchez v. Rivera–Cordero*, 835 F.2d 947, 949 (1st Cir.1987). This argument, therefore, fails on its own terms.

---

**10.** 18 U.S.C. § 2515 provides,

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, *grand jury*, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

(Emphasis added.)

Vest's second argument is that we should exercise our supervisory powers in order to deter future violations of Title III. Even under *Mechanik,* the federal courts still have the responsibility to supervise the government's use of its prosecutorial powers. *See United States v. Bucci,* 839 F.2d at 832 (1st Cir.1988) ("[W]e recognize that there could be allegations of grand jury abuse so troubling as to warrant an assessment, under *Mechanik,* of whether the 'societal interest in deterring the type of abuse alleged' outweighed the 'societal costs of retrial....'" (quoting *United States v. Larouche Campaign,* 829 F.2d 250, 253 (1st Cir.1987))).

To warrant dismissal of an indictment, a prosecutor's misconduct must amount to "serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *United States v. Ogden,* 703 F.2d 629, 636 (1st Cir.1983). Here, although the tape was ultimately ruled to be improper evidence, *Vest I,* 813 F.2d 477, we do not find the action of presenting it to the grand jury to have been "serious and blatant misconduct." Under the government's interpretation of Title III, the tape would have been legal. That interpretation was not frivolous, and the issue had not, at the time, been addressed by a federal appellate court. The one district court opinion addressing the issue lent support to the legality of the government's action. *See United States v. Traficant,* 558 F.Supp. 996, 1001–02 (N.D.Ohio 1983); *Vest I,* 813 F.2d at 483 (rejecting the conclusion reached in *Traficant* ). In addition, three days before our decision in *Vest I,* another federal appeals court issued an opinion which supported the interpretation of the law advocated by the government.[11] Thus the government was acting in accord with a reasonable if incorrect construction of the law. Such conduct does not threaten harm to the integrity of the judicial system. To penalize the government when it acts in good faith is unlikely to have a deterrent effect on future "misconduct." *Cf. United States v. Leon,* 468 U.S. 897, 918, 104 S.Ct. 3405, 3418, 82 L.Ed.2d 677 (1984) ("We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.").

The case on which Vest relies is not to the contrary. In *United States v. Brodson,* 528 F.2d 214 (7th Cir.1975), Justice Clark, sitting by designation, authored an opinion affirming a district court's decision to dismiss an indictment as a remedy to the government's violation of Title III. However, in contrast to this case, the government's actions *could* be characterized as blatant misconduct. First, the court found "no merit" in the government's argument that it had complied with Title III. *Id.* at 215. Second, the government agents in *Brodson* had conducted the illegal wiretapping, while in this case, Jesse Waters performed the illegal taping, and the government used the evidence given them by Waters. Although the government's use of the tape was itself illegal, *see Vest I,* there is a greater insult to the judicial process when the government itself conducts the illegal wiretap. We agree with Justice Clark that dismissal of the indictment is the "ultimate sanction" and a "drastic remedy." *Id.* at 216. The present case does not warrant the "drastic remedy" of such dismissal.

Vest also argues that because the government violated a statute, rather than, for example, the Federal Rules of Criminal Procedure as in *Mechanik,* the indictment must be dismissed. We find this unpersuasive. The Supreme Court has stated that even a constitutional violation does not automatically require dismissal of an indict-

---

**11.** *See United States v. Underhill,* 813 F.2d 105, 112–15 (6th Cir.1987). In *Underhill,* the Sixth Circuit reversed the district court's decision to exclude tapes that were illegally recorded under Title III. The court reasoned that the tapes were admissible despite 18 U.S.C. § 2515 (1982) because they were used against the persons who had made the tapes and against coconspirators of those persons.

ment. *See United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) (stating that a valid indictment is not subject to challenge even if it is based on information obtained in violation of defendant's fifth amendment rights). If Vest is suggesting that Title III itself mandates that the indictment must be dismissed, we find no support for the proposition in the statute. The language of the statute contains no such rule. Furthermore, in *In re Ellsberg,* 446 F.2d 954 (1st Cir.1971) (two-judge panel), this court examined the legislative history of Title III, and "note[d] the intent of Congress not to change the historic bar against a defendant's impeaching a grand jury indictment." *Id.* at 959. In conclusion, although the government violated Title III when it played the tape to the grand jury, we do not find the presence of the type of misconduct which warrants dismissal of the indictment.[12]

*Affirmed.*

---

12. Vest also argues that we should dismiss the indictment because the prosecutor knowingly presented false testimony to the grand jury. This issue was not raised below, and is thus waived. In addition, Vest provides no evidence to back up this assertion. The specific claim is that the government knowingly employed perjured testimony of Jesse Waters. However, Vest does not cite to minutes of the grand jury to back up the claim. Instead, Vest cites to portions of Waters's *trial* testimony which, allegedly, show that Waters had a propensity to lie. Vest also cites to a cryptic reference in the trial transcript to a polygraph test of Waters. Even if the argument were not waived, this evidence is entirely insufficient to show that the prosecutor knowingly employed perjured testimony.