UNITED STATES of America, Appellee,

v.

Joseph PIVA, Defendant, Appellant.

No. 87–1871.

United States Court of Appeals,
First Circuit.

Heard June 6, 1988.

Decided March 21, 1989.

Elizabeth A. Lunt with whom Norman S. Zalkind, by appointment of the Court, and Zalkind, Sheketoff, Homan, Rodriguez & Lunt, Boston, Mass., were on brief, for defendant, appellant.

R.J. Cinquegrana, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN and SELYA, Circuit Judges, and ACOSTA,* District Judge.

ACOSTA, District Judge.

Joseph Piva ("appellant") appeals from his conviction of conspiracy to distribute

* Of the District of Puerto Rico, sitting by designa-

more than one thousand pounds of marijuana. He argues that the trial court erred (1) in instructing the jury on the defense of withdrawal from the conspiracy and (2) in allowing a state police officer to repeat statements made to him by one of appellant's co-conspirators, Anthony Pacheco ("Pacheco"), who subsequently became a government informant. Because we find no reversible error, we affirm.

## THE FACTS

Between late December 1982 and early January 1983, a group led by Peter, Paul and Maurice "Buzzy" Dionne was making arrangements to import a large quantity of marijuana into this country. The basic plan was to use a fishing boat to rendezvous on the high seas with a drug-laden mother ship, the JUAN XXIII.

The scheme did not succeed because the vessel was spotted by a United States Coast Guard patrol aircraft whereupon it dumped its cargo overboard. The following day, January 6, 1983, personnel from the Coast Guard Cutter CHILULA boarded and seized the JUAN XXIII and arrested its crew.

Some of the intended drug importers sailed to meet the JUAN XXIII in the fishing boat WANDERER. This vessel, which was also spotted by a Coast Guard patrol aircraft on January 5, 1983, returned to port after dumping overboard equipment and supplies it was taking to the JUAN XXIII.

The WANDERER conspirators were not identified until 1985 when the disgruntled co-conspirator, Pacheco, became a government informant in order to avenge himself for a slight unrelated to this case. Pacheco, a motorcycle gang member with a long criminal history who had acted as security chief for the failed drug operation, contacted Massachusetts State Police Trooper Joseph Costa ("Trooper Costa") in March of 1985 and "told all."

Pacheco's testimony revealed that appellant's part in this conspiracy consisted of (1) procuring a dock to off-load the marijuation.

na onto land; (2) showing the dock facility to the person (Pacheco) who was to be in charge of "security" during the off-loading operation; and (3) attempting to procure and to captain the intended fishing vessel, which he did not do because the price of the vessel he tried to purchase was too high.

Appellant was tried separately from the other conspirators and eventually all were convicted.

The record reflects the following immunized testimony by Pacheco during appellant's separate trial:

1. In December 1982, Pacheco attended a meeting at Buzzy Dionne's house where Buzzy told Peter Dionne, in appellant's presence, that he had paid appellant ten thousand dollars for a dock.

2. During another meeting four or five days later, Peter Dionne gave Pacheco a bag containing one hundred thousand dollars in cash, and asked Pacheco to hold it for him.

3. One or two days later, Pacheco returned the money to Peter Dionne who gave it to appellant.

4. During another meeting at Buzzy Dionne's house, Peter Dionne told Pacheco that appellant would receive between twenty and fifty thousand dollars and would keep the off-load boat in return for his services.

5. Appellant also took Pacheco to a dock which he said was a good off-load area. He showed Pacheco the guard shack from which he could act as a look out, and added that once a truck was backed up to the dock, no one could see what was happening inside.

6. During another meeting, Peter Dionne asked Pacheco to "beat up" appellant because he had only returned $75,000 of the $100,000 he had been given after being unable to buy a boat.[1] (Pacheco did not carry out the assault and he did not see appellant again in the context of the conspiracy.) During this meeting, Peter

Dionne stated that he and a cousin would obtain another off-load boat. Appellant was not involved in this part of the operation.

7. Pacheco became a government informant to get back at some of his co-conspirators, but did not include appellant among the targets of his revenge.

On cross-examination, Pacheco's testimony was impeached (1) when he was confronted with a statement to the federal Grand Jury that he had given the $100,000 to appellant in a meeting at a cafe; (2) when it was pointed out that Pacheco had not mentioned appellant in a 34–page statement given to law enforcement officers in June 1986; (3) with questions implying that agents of the Department of Labor might have suggested the names of certain docks to him; and (4) when it was brought out that he had been paid close to $20,000 by law enforcement agencies to ensure his cooperation and that he would receive additional funds in order to relocate his residence.

Trooper Costa was allowed to testify as to the following statements made to him by Pacheco.

1. During a conversation on April 16, 1985:

a) Pacheco told Trooper Costa that he wanted to become an informant because he wanted revenge on four of the co-conspirators. Trooper Costa knew the persons mentioned. Appellant was not among them.

2. During a February 1986 conversation Pacheco told Trooper Costa:

a) That he (Pacheco) attended meetings at Peter Dionne's house, with appellant present, during which the operation was discussed.

b) That Peter Dionne asked him (Pacheco) to hold $100,000.00 in cash which was to be used to buy a boat.

---

1. Pacheco testified that appellant had not been able to obtain the boat because the owner wanted $150,000 for it.

c) That he returned the money to Peter Dionne, who gave it to appellant who was to use it to buy the boat.

d) That he (Pacheco) was present when appellant returned some of the money after being unable to purchase a boat.

e) That appellant had twice taken him (Pacheco) to a fishing dock where appellant was working as a watchman. There, they observed the comings and goings of police and other passersby. Appellant also told Pacheco that should anyone be working late at the dock where he (appellant) was working, he would get the keys to two other docks which could be used to off-load the boat.

f) That the venture fell apart because the Coast Guard seized the mother ship.

Testimony of eight other witnesses and other evidence that appellant had worked at the target dock on or about the time of the conspiracy was also heard. There were also copies of checks totalling $75,000 issued to a lawyer acting on behalf of appellant on January 5, 1983 and cashed by appellant on January 6, 1983.

The jury returned a verdict of guilty.

## THE CONSPIRACY INSTRUCTIONS

Appellant attacks the trial judge's instructions on conspiracy, which we must scrutinize in light of the entire charge to the jury. *See, e.g., United States v. Glantz,* 847 F.2d 1, 8–12 (1st Cir.1988).

The trial judge instructed the jury as follows on the subject of conspiracy:

> * * * a person cannot withdraw from a conspiracy after the person knows that it has either failed or succeeded. Any withdrawal has to take place before the person either knows of failure or knows of success of the venture.

Trial Transcript, volume 4 at page 89 (hereinafter "T. [volume # ]:[page # ]"). Later, in response to a written question from the jury about withdrawal, the judge recalled the jurors to the courtroom and gave them the following instructions:

> I told you the defendant has asserted, has claimed not only, he not only denies that he ever became a member of the conspiracy, but he also says that he withdrew from any relationship that the Government says was a conspiracy. And he says that he withdrew before he knew that the conspiracy had succeeded or failed, before he knew whether the object was attained or whether they were simply never going to get there.
>
> With respect to the legal principles of withdrawal, once a person becomes a member of a conspiracy, that person is a member of that conspiracy unless he withdraws, and by withdrawing I mean, unless he takes some affirmative step to get out of it and he let[s] the other members of the conspiracy know that he's doing that, and he let[s] them know in such a way that they know he's doing that.
>
> Do you understand so far?
>
> Simply disagreeing with the conspiracy or becoming disinterested in the conspiracy or in any member of the conspiracy is not enough. In order to withdraw, a member of the conspiracy has to take active steps to remove himself from the conspiracy and to let the others know that he's doing that, the other[ ] members of the conspiracy.
>
> Now, I told you that the Government has to prove beyond a reasonable doubt that there was a conspiracy and that the defendant willfully became a member of the conspiracy.
>
> On the question of withdrawal, you only get to that if the defendant can point to some evidence, he doesn't have to offer any witnesses, he can rely on the evidence that the Government offered, but he has to point to some evidence that is before you that shows that he did take some active step to get out of the conspiracy.
>
> Once he has done that, the Government has the burden again of proving beyond a reasonable doubt that he did not withdraw.
>
> Do you understand that, do you understand the sequence? Yes?
>
> So, I suggested to you that you should first consider whether there was a conspiracy; second, if you find there was

one, whether the defendant willfully became a member. And if you found that he willfully became a member, then look at the evidence and see whether the defendant has, in your minds, whether you agree with the defendant that there was some evidence that showed that he withdrew, and then the Government has to prove to you beyond a reasonable doubt that he did not withdraw. Okay?

It's a complicated sequence, do you understand it?

Do you wish me to go through it again? Do you want me to explain it again? All right. Let me—yes?

JUROR NO. 6: Is there a time period by which he has to withdraw?

THE COURT: Yes. Thank you for reminding me.

*If there is to be withdrawal, it has to be before it is known whether the venture succeeded or failed, indeed, before the venture fails or succeeds. Once the object of the conspiracy has been achieved, or once the venture has just gone down the tube, you can no longer withdraw.*

T. 4:101–103 (emphasis added).

The first part of this charge presents a *subjective* time limitation for withdrawal, whereas the last paragraph (which we have underlined) presents an *objective* time limit. An *objective* test is the more appropriate one since it would fit the rationale for the asserted defense of withdrawal, which is to create an incentive for persons either to report and prevent the commission of a crime or to refrain from *actually* participating in it. Public policy and common sense require this to occur prior to the consummation of the crime or its failure.

■ At the end of his last instruction to the jury, in response to a question, the judge emphasized a conspirator's knowledge of the viability of the conspiracy vis-á-vis the defense of withdrawal. However, the question of whether or not appellant actually knew of the failure of the drug exchange in the high seas is wholly irrelevant because the record shows, beyond a reasonable doubt, that appellant failed to prove that he withdrew from this conspir-

acy *at any time.* See *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) ("Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.") Therefore, even assuming *arguendo* that the trial judge erred in giving the challenged instruction, such error was harmless because appellant had not withdrawn from the conspiracy. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ There are two ways of withdrawing from a conspiracy, both requiring *affirmative* action by the conspirator: (1) to confess to the authorities or (2) to communicate to the co-conspirators that the conspirator has abandoned the conspiracy and its goals.

The law with respect to withdrawal has been frequently stated. '[M]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal.' In order to withdraw, a conspirator must act affirmatively either to defeat or [to] disavow the purposes of the conspiracy. Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals.

*United States v. Juodakis,* 834 F.2d 1099, 1102 (1st Cir.1987) (*per curiam*).

■ Before deciding the question of withdrawal, we must establish the scope of the conspiracy *as to this particular conspirator.*

The gist of a conspiracy offense is the agreement. Consequently, it [is] 'essential to determine what kind of agreement or understanding existed as to *each* defendant.' The agreement would not necessarily be the same with respect to each defendant in a multifaceted drug conspiracy; the agreement among the core members might embrace more extensive operations than the agreement between core participants and lower echelon personnel or helpmates whose involvement

was more peripheral. To warrant conviction, 'the Government must present evidence justifying the jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation ... and the scope of his agreement must be determined individually from what was proved as to him.' * * *

*Juodakis*, 834 F.2d at 1104 (citing *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir.1964), *cert. denied sub nom., Cinquero v. United States*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)) (emphasis in the original).

Appellant's role in this conspiracy consisted of (1) procuring a dock to off-load the marijuana onto land; (2) showing the dock facility to Pacheco; and (3) procuring and operating the intended fishing vessel.

Defendant's "withdrawal" occurred, if at all, when he returned the purchase money for the boat to the Dionnes. But the return of the money came only after appellant had completed his first two duties within the conspiracy for which he was paid, i.e., getting the dock and showing it to Pacheco. Furthermore, the return of the money was not motivated by a desire to withdraw from the conspiracy. He had no change of heart. The money was returned simply because he was unable to make the purchase due to the higher sale price. Moreover, he did not even return all the money. Appellant had deducted his pre-arranged share, i.e., $25,000, before returning it to the Dionnes. This is far from the type of affirmative action needed to indicate a change of heart to sustain the defense of withdrawal. Therefore, appellant did not effectively withdraw from this conspiracy.

## THE PRIOR CONSISTENT STATEMENTS

Overruling the defense's hearsay objection, the trial judge allowed Trooper Costa to repeat statements made to him by Pacheco when the latter became an informant, finding that the evidence was admissible as "prior consistent statements" under Fed.R.Evid. 801(d)(1)(B), which, in relevant part, reads as follows:

A statement is not hearsay if—
**(1) Prior statement by witness.**
The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive, * * *.

■ Appellant argues that the evidence fails the first requirement of this Rule and was thus inadmissible because the declarant (Pacheco) was not cross-examined about these statements. While it is true that the declarant must be *available* for cross-examination regarding this type of statement, *United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir.1988), there is no indication in the record that the defense was precluded from recalling Pacheco for re-cross or from exploring the content of the statements and the circumstances under which they were made. Therefore, we find that the declarant was available for cross-examination and thus the alleged omission, if any, can only be attributed to appellant.

■ As to the second requirement of Rule 801(d)(1)(B) the trial court's determination that the statements are being used to "rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive" will only be overturned if it is clearly erroneous, because it is a factual finding. *See* Fed.R. Evid. 104(a) and *Vest*, 842 F.2d at 1329. The trial court's finding on this point was not clearly erroneous.

Part of appellant's defense was that the United States Department of Labor, among others, was somehow trying to implicate him in the crime because of his union activities.[2] At trial, defense counsel suggested

**2.** Appellant is a Port Agent for the Seafarer's Union, which was negotiating a new contract around the time of appellant's arrest.

in argument and in cross-examination that Pacheco had not mentioned appellant's name until after he was visited by a Department of Labor investigator. Additionally, defense counsel characterized Pacheco as a "one-man crime wave" who was trying to stay out of jail by turning government informant. This approach by defense counsel forced the government to attempt to rehabilitate its witness's credibility. The judge properly concluded that such rehabilitation of Pacheco's credibility was appropriate. *See United States v. Patterson*, 644 F.2d 890, 900–901 (1st Cir.1981) ("Defendants undertook to impeach [the declarant] by suggesting that he was testifying out of self-interest and that his own conduct showed lack of regard for the law. The jury could have thought it was being suggested that [the declarant's] testimony was recently fabricated or improperly influenced.")

Finally, appellant submits that there is yet a *third* requirement for admissibility pursuant to Rule 801(d)(1)(B). Specifically, he argues that the admission of the February 1986 [3] statements into evidence was erroneous because Pacheco made these assertions *after* he had reasons to fabricate testimony, to wit, avoiding jail, making money, and getting revenge on his cohorts.[4] Our review of the record convinces us that this fine-tuned evidentiary argument was not preserved for appeal because appellant failed to make "a timely objection * * * stating the specific ground of [that] objection." Fed.R.Evid. 103(a)(1).

Appellant objected to Trooper Costa's testimony on the ground that it was hearsay.[5] After a brief recess, the judge admitted the evidence specifically overruling the hearsay objection by citing Rule 801(d)(1)(B). At this point defense counsel had a duty to "call [his specific objection] to the attention of the trial judge, so as to alert [her] to the proper course of action * * *." Notes of the Advisory Committee on Proposed Rule 103(a). But counsel failed to tell the trial judge why an apparently on-point exception to the hearsay rule arguably did not apply. Although he contended that the evidence was hearsay and that it was being improperly used to rehabilitate Pacheco's testimony,[6] counsel did not argue at trial that the evidence was inadmissible because it was made after the declarant had acquired a motive to fabricate. This lack of specificity, after the judge believed she had resolved the objection, precludes appellant from raising this issue for the first time before us. *See United States v. Figueroa*, 818 F.2d 1020, 1025 (1st Cir.1987) ("[A]n issue not raised

---

3. Until this point, we have not differentiated between the 1985 and the 1986 statements; however, the discussion that follows is directed exclusively to the 1986 declarations.

4. There is a conflict among the Courts of Appeals regarding the effect of a motive to fabricate on admissibility of statements pursuant to Rule 801(d)(1)(B). *See generally* Judith A. Archer, Note, *Prior Consistent Statements: Temporal Admissibility Standard Under Federal Rule of Evidence 801(d)(1)(B)*, 55 Fordh.L.Rev. 759 (1987). The majority view is that statements made after the declarant had acquired a motive to lie are not substantively admissible as prior consistent statements. *See, e.g., United States v. Bowman*, 798 F.2d 333 (8th Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987); *United States v. Henderson*, 717 F.2d 135 (4th Cir.1983), *cert. denied*, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *United States v. Rohrer*, 708 F.2d 429 (9th Cir.1983); *United States v. Quinto*, 582 F.2d 224 (2d Cir. 1978). The minority view is that the motive to lie affects the weight to be given to the evidence by the trier of fact, not its admissibility. *See,*

*e.g., United States v. Parry*, 649 F.2d 292 (5th Cir. Unit B 1981); *United States v. Hamilton*, 689 F.2d 1262, 1273–74 (6th Cir.1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983) (though not expressly rejecting the temporal admissibility requirement, it expresses "uneasiness" with the *Quinto* opinion).

Because we find that appellant failed to preserve the issue for appeal, we express no opinion on this matter.

5. He also objected to it on the ground that its probative value was substantially outweighed by the possibility of unfair prejudice to him, an argument that he also makes on appeal and which we discuss below. Additionally, he objected to the evidence on relevance grounds, but that argument is not now before us.

6. Appellant's counsel stated: "[The testimony] is hearsay, it is clearly hearsay. It's a way of somehow making this maggot[,] Mr. [ ] Pacheco, this legal crime wave into somehow [sic, someone?] believable, because it comes through the lips of Mr. Costa." T. 3:55.

below cannot be raised for the first time on appeal.") (citing *United States v. Argentine,* 814 F.2d 783, 791 (1st Cir.1987) (quoting *Nogueira v. United States,* 683 F.2d 576, 580 (1st Cir.1982)).

■ Appellant further argues that the February 1986 statement[7] should have been excluded pursuant to Fed.R.Evid. 403.[8] Appellant cites *United States v. Mazza,* 792 F.2d 1210 (1st Cir.), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987), in support of this contention. While we agree with appellant that "the government effectively managed to have the jury hear a second-hand account of [the informant's] entire story through [a] witness[ ] whose credibility the jury was less apt to question," 792 F.2d at 1215, we do not find it to be reversible error. Here, the testimony of Trooper Costa was admitted after Pacheco's testimony, whereas in *Mazza* the agents' testimony came at the opening of the trial. Thus we are not faced here with the *Mazza* danger that the agent would testify as to items that would never come into evidence, nor would Pacheco's testimony be bolstered by the law enforcement officer *before* the jury could evaluate it independently. Furthermore, the government was justified in seeking admission of this testimony because of the defense's attacks on the informant's credibility. The defense fully explored before the jury Pacheco's possible motives to fabricate testimony as well as his status as a paid informant, and the jury reached its own conclusions. Accordingly, we find that the trial court carefully considered the possibility of unfair prejudice in the admission of this testimony and acted within its considerable discretion in rejecting the Rule 403 challenge.

## TROOPER COSTA'S STATEMENTS

■■ In addition to repeating the statements discussed in the preceding section of this opinion, Trooper Costa testified that during the April 1985 conversation he asked for more specific information in order to evaluate Pacheco's credibility. The Trooper then stated, over objection, "I told him I had to find the trust in him[ ] because we had never dealt together before, and the only way we could do that was that he had to tell me the truth whenever I asked him." T. 4:63.

This testimony merits separate discussion because it deals with a professional government witness vouching for the credibility of an informant. "We have stated, more often than we care to remember, that it is wrong for a prosecuting attorney to inject his personal beliefs into [a trial]." *United States v. Mejia–Lozano,* 829 F.2d 268, 273 (1st Cir.1987). We particularly disapprove of attempts by the government to characterize their witnesses as trustworthy. *See, e.g., United States v. Martin,* 815 F.2d 818, 821 (1st Cir.1987). The fact that the impermissible vouching is elicited from a government witness makes little difference. *See United States v. Price,* 722 F.2d 88 (5th Cir.1983) (I.R.S. agent's testimony, elicited by the prosecution, that he believed statements by other government witnesses constituted reversible error). Although we conclude that admission of this testimony did not constitute reversible error, the United States Attorney's office would be well advised not to use its professional witnesses to vouch for the credibility of their informants.

In this case, any unfair prejudice was eliminated—or reduced to harmless error— by the trial judge's timely instruction to the jury that Trooper Costa's opinion of Pacheco's credibility was of no concern to them and that they had to make their own evaluation of the informant's testimony.[9] *Cf.*

---

**7.** Though conceding that no objection was made, appellant challenges the admission of Pacheco's own testimony regarding this statement. Appellant's Brief at 30 n. 6. We find that admission of this testimony did not constitute plain error. *See* Fed.R.Evid. 103.

**8.** In relevant part, Fed.R.Evid. 403 reads as follows:

Although relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice, * * *.

(Emphasis added.)

**9.** The Court stated:

Members of the jury, you have to make a determination whether you believe Mr. Pache-

*Price,* 722 F.2d at 88 (failure to give specific curative instruction on vouching was error). Nevertheless, we warn that the better practice is to exclude this type of vouching from the evidence.

### CONCLUSION

Having found no reversible error in appellant's trial, the judgment of conviction is AFFIRMED.

co. Whether Mr. Costa believes him or not is not relevant to that, you have to make that determination, based on your own observations of Mr. Pacheco and only that, and your judgment as to whether he was telling the truth.
T. 3:63.