UNITED STATES, Plaintiff, Appellee,

v.

**Ralph ROSARIO–DIAZ, a/k/a Juni, Defendant, Appellant.**

United States, Plaintiff, Appellee,

v.

**Wilson Montalvo Ortiz, a/k/a Willie Barber, Defendant, Appellant.**

United States, Plaintiff, Appellee,

v.

**Juan Antonio Baez–Jurado, a/k/a Papo, Defendant, Appellant.**

United States, Plaintiff, Appellee,

v.

**Wilfredo Lopez–Morales, Defendant, Appellant.**

United States, Plaintiff, Appellee,

v.

**Ada Melendez–Garcia, Defendant, Appellant.**

Nos. 98–2151 to 98–2153, 98–2328, 99–1015.

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1999.

Decided Jan. 31, 2000.

Rachel Brill and Bruce J. McGiverin, by appointment of the Court, were on consolidated brief, for appellants Ralph Rosario–Díaz and Wilson Montalvo–Ortiz.

Lydia Lizarribar–Masini and Ramón García, by appointment of the Court, were on consolidated brief, for appellants Juan Antonio Báez–Jurado and Ada Meléndez–García.

Vilma María Dapena, by appointment of the Court, with whom Dapena & Dapena Law Offices was on brief, for appellant Wilfredo López–Morales.

Sonia I. Torres, Assistant United States Attorney, with whom Guillermo Gil, United

States Attorney, Jorge E. Vega–Pacheco, Chief, Criminal Division, and Camille Vélez–Rivé, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL and WALLACE,* Senior Circuit Judges.

TORRUELLA, Chief Judge.

Ralph Rosario–Díaz, Wilson Montalvo–Ortiz, Ada Meléndez–García, Juan Báez–Jurado, and Wilfredo López–Morales were each convicted on both counts of a grand jury indictment charging them with (1) aiding and abetting each other in a carjacking that resulted in the death of the victim, in violation of 18 U.S.C. §§ 2 & 2119(3); and (2) conspiring to commit that carjacking, in violation of 18 U.S.C. § 371. The district court sentenced each defendant to life in prison on each count, the sentences to run concurrently. All five defendants now appeal.

Because we hold that appellants Rosario–Díaz and Montalvo–Ortiz did not have the requisite foreknowledge that a carjacking crime was to be committed, their convictions must be set aside. We affirm the convictions of appellants Meléndez–García, Báez–Jurado, and López–Morales, although we remand for resentencing on their conspiracy convictions.

## I. BACKGROUND

### A. *The Conspiracy and the Carjacking*

On June 9, 1995, defendants Ralph Rosario–Díaz and Wilson Montalvo–Ortiz placed a telephone call to Gregorio Aponte–Lazú, who would later be a codefendant in this case and ultimately the government's star cooperating witness. Rosario–Díaz informed Aponte–Lazú that Aponte–Lazú's brother-in-law, Fonsi, a runner in Rosario–Díaz's drug ring, had been killed the preceding day. Rosario–Díaz told Aponte–Lazú that among Fonsi's belongings had been found a list of persons who they believed to have Fonsi's drug money. The list included the name of Edna Rivera–Hernández.

Rosario–Díaz told Aponte–Lazú that he had a job for him—to find Edna and retrieve the $200,000 she was thought to have. In exchange, Aponte–Lazú would receive $25,000. If Edna should refuse to return the money, Aponte–Lazú was to kill her and make it look like a robbery. To facilitate the crime, Rosario–Díaz provided Aponte–Lazú with several pieces of information, including Edna's address, the color and make of her car, as well as some of the numbers of the car's license plate. He also told Aponte–Lazú that Edna studied at the American City College (ACC), where Rosario–Díaz and Montalvo–Ortiz worked.

On Tuesday, June 13, 1995, Rosario–Díaz pointed Edna out to Aponte–Lazú at the ACC. At that point, Rosario–Díaz, Montalvo–Ortiz, and Aponte–Lazú discussed the planned participation of defendant Juan Báez–Jurado. Rosario–Díaz explained that Aponte–Lazú was to meet Báez–Jurado the following Friday, June 16, 1995. Montalvo–Ortiz instructed Aponte–Lazú not to rape Edna, but stated that he should kill her if necessary.

On Friday, June 16, 1995, as planned, Aponte–Lazú met Báez–Jurado in a local plaza. With Aponte–Lazú was defendant Ada Meléndez–García, who also knew Báez–Jurado. The three agreed that they would carry out their contract on Tuesday, June 20, 1995. Báez–Jurado agreed to bring a firearm.

On the appointed day, Aponte–Lazú met in the plaza with Meléndez–García, who had her son with her due to a field day at the elementary school. Aponte–Lazú then went to the ACC, where Rosario–Díaz informed him that Edna would be at a doctor's appointment that day, rather than at the college. Aponte–Lazú expressed his feeling that the crime would therefore be

* Of the Ninth Circuit, sitting by designation.

easier, because they would not have to go to Edna's house. Montalvo–Ortiz, however, warned Aponte–Lazú to be careful because a law enforcement drug division was located near the doctor's office.

Aponte–Lazú and Meléndez–García returned to the town plaza, where Báez–Jurado was waiting with defendant Wilfredo López–Morales, whom Meléndez–García said she knew. Báez–Jurado informed them that he had not brought a weapon as they had planned. The five of them, Aponte–Lazú, Meléndez–García, her son Víctor, Báez–Jurado, and López–Morales, then walked the streets near the plaza. They saw Edna, who got out of her car and entered a pediatrician's office with her four-month-old baby. Aponte–Lazú and the others went to a nearby supermarket and purchased a knife.

Eventually, Edna exited the doctor's office and moved towards her car, pushing her baby in a stroller. Aponte–Lazú, Meléndez–García, and Víctor approached the car at the same time as Edna, complimenting and inquiring about her baby. When Edna had placed her car key in the car door, Aponte–Lazú put the knife to her ribs. Báez–Jurado and López–Morales appeared, and Edna was forced into the back seat with them and Víctor.

Aponte–Lazú drove the car away from the plaza. From Edna's purse, appellants removed twenty-six dollars in cash and a bank card, the access code for which Edna divulged before she was killed. Aponte–Lazú asked Edna for the $200,000, but she responded that she did not have it and that she had returned it to Fonsi before he was killed. At Aponte–Lazú's instruction, Meléndez–García then slapped Edna.

After leaving the plaza area, Aponte–Lazú stopped to purchase crack, marijuana, and heroin. Aponte–Lazú, Báez–Jurado, and López–Morales consumed the drugs in the car as they drove. Meanwhile, they continued to slap Edna and threatened to kill her baby.

Near the Guayanez River, the car became stuck in a sugar cane bank, and Aponte–Lazú, Báez–Jurado, López–Morales, and Edna exited the car. While Meléndez–García sat in the car with Edna's baby, the rest of the group went to a secluded area surrounded by bamboo trees, and Edna was ordered to sit on a towel. While Edna protested that she had returned all the money, she was asked intimate questions by Aponte–Lazú while Báez–Jurado wielded the knife. Aponte–Lazú, Báez–Jurado, and López–Morales then each raped Edna and even placed young Víctor on top of her naked body in a grotesque simulation of their acts.

After the rapes, Edna was ordered to put her clothes back on. While threatening to kill her baby, Aponte–Lazú, Báez–Jurado, and López–Morales beat Edna with their fists and with a bamboo stick. Aponte–Lazú then ordered López–Morales to drag Edna to the river, presumably to drown her. When Edna resisted, Aponte–Lazú told Báez–Jurado to help. Báez–Jurado entered the river and slit Edna's throat. They left her body in the river, where it was found decapitated on July 7, 1995.

After killing Edna, Aponte–Lazú and appellants managed to extract the car from the sugar cane bank and fled the area. Aponte–Lazú telephoned Rosario–Díaz and informed him that Edna was dead but that they still had her car and her baby. Rosario–Díaz instructed them to leave the car and baby at a safe place.

Aponte–Lazú and Meléndez–García attempted unsuccessfully to use Edna's bank card at a retail store. Aponte–Lazú and appellants then drove to the city of Gurabo, where Aponte–Lazú was able to withdraw seventy dollars from Edna's account.

Aponte–Lazú and the appellants next drove to Caguas Central, where Edna's baby began to cry. When Meléndez–García tried to feed the baby some juice, it choked. Aponte–Lazú and appellants drove to the Caguas Municipal Hospital, where the baby was examined and re-

leased. When Aponte–Lazú and Meléndez–García exited the hospital, however, Báez–Jurado had left the group. The remaining four proceeded to Meléndez–García's house, where Meléndez–García bathed and fed the baby.

Later that evening, Aponte–Lazú and López–Morales drove the baby to Luquillo. On the way, they had a minor accident, but they finally arrived in Luquillo, where the baby was abandoned in front of a residence.

That same evening, Edna's husband and his brother began to search for Edna. On the highway, they spotted her car, driven by Aponte–Lazú, and gave chase. Edna's husband was able to turn off the ignition of Edna's car using a spare remote control for the car's alarm system. When Edna's car stopped, Aponte–Lazú ran away but was apprehended by the husband and his brother. Edna's ring and bracelet were found on Aponte–Lazú's person. When the police arrived, the knife and a photo of Aponte–Lazú were found in Edna's car.

**B.** *The Investigation and Trial*

On June 15, 1995, after being apprehended by Edna's husband, Aponte–Lazú gave the first of several inconsistent statements to law enforcement. Among those statements was the assertion that López–Morales had had nothing to do with the crime, which the government claimed at trial was made in an attempt to gain the release of López–Morales so that López–Morales could murder the government's witnesses. Subsequent to his guilty plea in July of 1995, Aponte–Lazú began to divulge the details of the crime to investigators.

On June 25, 1995, FBI agents conducted a consent search of Meléndez–García's residence and found various items tied to the abduction of Edna. After waiving her rights, Meléndez–García made a statement admitting some knowledge of the crime but in general denying direct involvement. The following day Meléndez–García gave a second statement detailing the crime and admitting her involvement. She attempted to lead the police to the body but could not find the scene.

On June 28, 1995, the FBI interviewed Báez–Jurado, who claimed that Meléndez–García had told him what had happened to Edna and where her body had been left. Báez–Jurado also attempted to lead the police to the crime scene but could not locate it.

On June 28, 1995, López–Morales was also interviewed. He denied knowing Meléndez–García or anything about Edna or her disappearance.

On May 6, 1996, a grand jury returned a two-count indictment charging Aponte–Lazú, Meléndez–García, Báez–Jurado, López–Morales, Rosario–Díaz, and Montalvo–Ortiz with (1) aiding and abetting each other in the commission of a carjacking in violation of 18 U.S.C. §§ 2 & 2119(3), and (2) conspiracy to commit that carjacking, in violation of 18 U.S.C. § 371. All defendants initially pled not guilty, although Aponte–Lazú subsequently changed his plea and agreed to cooperate with the United States.

Before trial, appellants Meléndez–García, Montalvo–Ortiz, Báez–Jurado, and Rosario–Díaz filed motions to suppress evidence. Hearings were held on two of the motions, and all of the motions were denied.

At trial, the prosecution's star witness was Aponte–Lazú, who testified extensively about the details of the crime and the participation of each defendant. Immediately after the testimony of Aponte–Lazú, the United States put FBI agent Daryl Huff on the witness stand. Over the objection of defense counsel, Agent Huff testified at length about his interactions with Aponte–Lazú during the investigation of the carjacking and murder of Edna. Agent Huff testified as to the interrogation techniques used with Aponte–Lazú, as to the statements made by Aponte–Lazú, and even as to how law enforcement evaluated

the veracity and reliability of Aponte–Lazú's statements. For example, Agent Huff identified omissions and falsities in Aponte–Lazú's statements:

A: Specifically with regards to why he traveled to Caguas, one of the lies. And also specifically about the rape. He had not mentioned that. And he also omitted the fact that Wilson Montalvo Ortiz and Ralph Rosario Díaz were involved in the carjacking or conspiracy of the carjacking fully. So, those were three of the lies.

Q: Okay. Now, how were those omissions discovered?

A: Again through interview and through seeing the discrepancies, inconsistencies and just things that didn't make sense in the statement. It became pretty obvious in most cases.

. . . . .

Q: And did you use or need a polygraph in order to do that? . . .

A: No, a polygraph is a last resort technique. There was no need for a polygraph in the particular situation. We were pinning him down without a polygraph. We could tell when he was lying.

Tr. of Nov. 25, 1995, at 22. Other trial testimony included expert testimony on the mental capacity of Meléndez–García.

On December 12, 1997, after twenty-three days of trial, a jury found each defendant guilty on both counts of the indictment. Rosario–Díaz and Montalvo–Ortiz filed a motion for a new trial, which all appellants joined; a hearing was held, and the district court denied the motion.

On August 27, 1998, appellants Rosario–Díaz and Montalvo–Ortiz were given life sentences on each count, to be served concurrently. Báez–Jurado was given the same sentence the following day, and López–Morales and Meléndez–García received the same sentences on October 30, 1998 and November 13, 1998, respectively.

All appellants filed timely notices of appeal.

## II. LAW AND APPLICATION

Appellants now challenge their convictions and sentences on a number of grounds. We begin with the joint arguments of appellants Rosario–Díaz and Montalvo–Ortiz.

### A. *Rosario–Díaz and Montalvo–Ortiz*

■ Although appellants Rosario–Díaz and Montalvo–Ortiz raise several issues on appeal, we find it necessary to reach only one—whether the evidence presented to the jury was sufficient to support guilty verdicts on Counts One and Two. We review a district court's Rule 29 determinations de novo. See United States v. Hernández, 146 F.3d 30, 32 (1st Cir.1998). Because we find that there was not sufficient evidence that Rosario–Díaz and Montalvo–Ortiz had the knowledge required to support a conviction for aiding and abetting a carjacking, we reverse their convictions on Count One. Similarly, we reverse their convictions on Count Two because the government failed to introduce evidence sufficient to establish that Rosario–Díaz and Montalvo–Ortiz conspired to carjack.

### 1. *Count One*

Rosario–Díaz and Montalvo–Ortiz claim that the evidence submitted at trial failed to prove that they had "foreknowledge" that Aponte–Lazú would carjack Edna's vehicle. They argue that their aiding and abetting convictions must therefore be reversed. After carefully reviewing the record and the relevant law, we agree.

■ To support a conviction for aiding and abetting, the government must prove, in addition to the commission of the offense by the principal, that the defendant " 'consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal.' " *United States v. Spinney,* 65 F.3d 231, 235 (1st

Cir.1995) (quoting *United States v. Taylor,* 54 F.3d 967, 975 (1st Cir.1995)). We have stated that the defendant's knowledge must be more than merely a " 'general suspicion that an unlawful act may occur.' " *United States v. Loder,* 23 F.3d 586, 591 (1st Cir.1994) (quoting *United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990)). However, we have also recognized the difficulty of precisely articulating the degree of knowledge required to support a conviction for aiding and abetting particular offenses. *See, e.g., Spinney,* 65 F.3d at 236–40 (discussing the "continuum" of mens rea requirements for aiding and abetting).

In *Spinney,* for example, we held that a conviction for aiding and abetting an armed bank robbery must be supported by evidence that the defendant was "on notice of the likelihood" that the principal would use a dangerous weapon in the commission of the bank robbery. *See id.* at 240. By contrast, we held that a conviction under 18 U.S.C. §§ 2 & 924(c) for aiding and abetting the use of a firearm in a crime of violence required proof that the defendant knew "to a practical certainty" that the principal would be using a gun. *See id.* at 238–39. Although we were not explicit, a fair reading of *Spinney* supports the proposition that the level of knowledge required to support an aiding and abetting conviction is related to the specificity of the principal offense, as to both mens rea and actus reus.

Not surprisingly, appellants urge us to adopt the higher "practical certainty" standard referred to in *Spinney.* However, we need not decide that issue today. Even under a less exacting "notice of likelihood" standard, we conclude that no reasonable jury could have found appellants Rosario–Díaz and Montalvo–Ortiz guilty beyond a reasonable doubt of aiding and abetting the carjacking of Edna Rivera–Hernández.

The United States argues that Rosario–Díaz and Montalvo–Ortiz should have known that Aponte–Lazú and his cohorts might choose a carjacking as a way to execute their contract on Edna, because Rosario–Díaz (in the presence of Montalvo–Ortiz) gave Aponte–Lazú the make and model of Edna's car, as well as some of the numbers from her license plate. The government also argues that, at the very least, Rosario–Díaz and Montalvo–Ortiz had knowledge that a carjacking was likely when they directed Aponte–Lazú to the doctor's office and Aponte–Lazú opined that such circumstance would facilitate the crime because it would avoid the need to go to Edna's house.

Before directly addressing the sufficiency of the factual evidence in this case, we would note that carjacking is a specialized offense, requiring a specific criminal act and a narrow mens rea. Rather than criminalizing any offense that involves a vehicle, Congress chose in 18 U.S.C. § 2119 to create federal crime only where the vehicle is "taken" by force and violence or by intimidation. As the Supreme Court held last term in *Holloway v. United States,* 526 U.S. 1, 119 S.Ct. 966, 970, 143 L.Ed.2d 1 (1999), the mental state required by the statute ("intent to cause death or serious bodily harm") is measured at the moment that the defendant demands or takes control of the vehicle. The focus of the statute is narrow.

When viewed in the light most favorable to the prosecution (as indeed we must view all evidence for these purposes), the evidence pointed to by the United States might fairly be deemed to raise a possibility that Aponte–Lazú would commit a carjacking. However, viewed in any light, we simply do not find that evidence to raise such a possibility to the level of a probability or a likelihood.[1] Based on the instructions and information that Rosario–Díaz and Montalvo–Ortiz provided to Aponte–Lazú, any of several scenarios were within the realm of possible means of confronting Edna and attempting to retrieve the $200,-

---

1. We presume that a "likelihood" in this context means a "reasonable likelihood," rather than a "high likelihood," or a "low likelihood," or "some likelihood."

000—burglary, confronting her near her home, confronting her on the street, confronting her at her car without attempting to "take" the vehicle, confronting her in connection with a carjacking, et cetera. It is noteworthy that, in addition to information about Edna's car, Rosario–Díaz gave Aponte–Lazú her home address as well as the location of her school. In other words, Aponte–Lazú was given information by which he might locate Edna at any time during the morning, day, or night, at any of the places that she could be foreseen to be—at home, at school, or elsewhere with her car. Significantly, the jury was not presented with a single discussion or instruction in which Rosario–Díaz or Montalvo–Ortiz mentioned or even alluded to a carjacking. In sum, we find no evidence whatsoever in the record that could reasonably be considered by the jury to make *carjacking* more likely than any of the other possible ways in which Aponte–Lazú could have carried out Rosario–Díaz and Montalvo–Ortiz's instructions. Where the offense actually committed by the principal is merely one of many (in this case, practically innumerable) possibilities, we see no difference between such "knowledge" and a "general suspicion" that a criminal act is underway or contemplated.

Because there was insufficient evidence in the record for the jury to reasonably find that Rosario–Díaz and Montalvo–Ortiz had the requisite foreknowledge that a *carjacking* would be committed, we must reverse their conviction on Count One of the indictment.

### 2. Count Two

Appellants argue that their lack of foreknowledge should also defeat their convictions on Count Two. We agree.

As we have held many times, "[t]o prove the elements of a conspiracy, the government must show beyond a reasonable doubt that the 'defendant and one or more coconspirators intended to agree and . . . to commit the substantive criminal offense which was the object of their un-

lawful agreement.' " *United States v. Escobar–de Jesús,* 187 F.3d 148, 175 (1st Cir.1999) (quoting prior cases from this Circuit); *see also Salinas v. United States,* 522 U.S. 52, ——, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense. . . ."). Viewing the evidence presented at trial in the light most favorable to the government, that evidence is insufficient to prove that Rosario–Díaz and Montalvo–Ortiz agreed to commit or intended to further a *carjacking.* No reasonable jury could have convicted them of such a conspiracy, and we reverse their convictions on Count Two of the indictment.

We take no pleasure in reversing the convictions of two appellants who were proven at trial to be the instigators of a nefarious criminal scheme that led to the brutal rape and murder of a young woman. The evidence produced at trial left no reasonable doubt that Rosario–Díaz and Montalvo–Ortiz conspired with Aponte–Lazú to rob and, if necessary, to murder Edna. Appellants were never charged with such a conspiracy, however, and we are powerless to undo that prosecutorial judgment. It is not unusual in this day and age for the federal government to prosecute narrow parts of criminal enterprises that would more logically (when viewed as a whole) be adjudicated in local courts. Indeed, the greater resources available to the federal government, at the investigatory and prosecutorial stages, often counsel in favor of such an approach. Nevertheless, and irrespective of the hideous nature of the crimes committed, a court of law is required to make its rulings on principled grounds. There are no such grounds for a ruling in the United States's favor on this issue, given the facts proven by the prosecution, and therefore cannot sustain appellants Rosario–Díaz and Montalvo–Ortiz's convictions on Counts One and Two.

## B. Meléndez–García and Báez–Jurado

The joint brief filed by appellants Meléndez–García and Báez–Jurado raises several issues on appeal, several of which are applicable to and joined by more than one appellant in this case. We will address the broadly applicable issues first, and then proceed to the appellant-specific issues.

### 1. Improper Bolstering by Agent Huff

■ Appellants argue that the testimony of FBI Agent Daryl Huff constituted improper bolstering of the testimony of cooperating witness Aponte–Lazú. We review the district court's admission of the challenged testimony under a harmless error standard. *See United States v. Josleyn,* 99 F.3d 1182, 1198 (1st Cir.1996). Although we are troubled by Huff's testimony, we hold that its admission was harmless error.

■ The case law is clear, and the parties agree, that prosecutors may not place the prestige of the United States behind a witness by making personal assurances about the credibility of a witness or by indicating that facts not before the jury support the witness's testimony. *See, e.g., United States v. Neal,* 36 F.3d 1190, 1207–08 (1st Cir.1994). It is also undisputed that the prosecution cannot accomplish such improper bolstering of a witness through the testimony of other government witnesses. *See United States v. Mazza,* 792 F.2d 1210, 1214–16 (1st Cir. 1986). Government witnesses may of course testify to facts within their personal knowledge that support or corroborate another witness's testimony. Indeed, in a case such as this one, where the bulk of critical testimony comes from a single cooperating coconspirator, the prosecution's principal task is often to convince the jury that the witness's account is credible. The prosecution simply must do so through competent and reliable evidence and not through improper vouching that could invite the jury to find guilt on the basis of something other than the evidence presented at trial.

■ We have no difficulty concluding that the testimony of Agent Huff was improper. Although Huff could properly have testified as to the actions he took to corroborate Aponte–Lazú's testimony, we think it obvious that he could not properly opine on whether particular statements by Aponte–Lazú were "lies," nor could he represent that the statements not singled out as lies had been "tested" and verified through interrogation techniques. Particularly in light of Huff's testimony concerning his training and experience in interrogation and investigation, the clear purpose and effect of his testimony was to put the prestige of his professional knowledge as a federal agent behind the testimony of Aponte–Lazú. That is the very definition of improper bolstering, and it is impermissible.

■ Nevertheless, we believe that this case is indistinguishable from *United States v. Piva,* 870 F.2d 753 (1st Cir.1989), in which we held that it was not reversible error to admit the testimony of a law enforcement officer detailing out-of-court statements by the defendant. The *Piva* panel distinguished our decision in *Mazza* using words that are equally applicable to the case presently under consideration:

> [T]he testimony of [the officer] was admitted after [defendant's] testimony, whereas in *Mazza* the agents' testimony came at the opening of trial. Thus we are not faced here with the *Mazza* danger that the agent would testify as to items that would never come into evidence, nor would [defendant's] testimony be bolstered by the law enforcement officer before the jury could evaluate it independently. Furthermore, the government was justified in seeking admission of this testimony because of the defense's attacks on the informant's credibility.

*Id.* at 760. In this case, Aponte–Lazú testified extensively before Agent Huff

took the stand, and Aponte–Lazú was subject to vigorous cross-examination. Furthermore, the district court took pains to instruct the jury that they were to judge Aponte–Lazú's credibility on the basis of his testimony alone, and not that of Agent Huff.[2] On these facts, and in light of the other probative evidence admitted in this case, we hold that the improper bolstering solicited by the prosecution from Agent Huff was harmless error not warranting reversal. We nevertheless take this occasion to issue a strong warning against the use of this procedure by government prosecutors and advise that they will tread on thin ice indeed if they continue to practice this technique in the future.

### 2. Denial of Motion for New Trial

■ Appellants next argue that the district court erred in denying a motion for a new trial submitted by appellants after their convictions. We affirm the district court's ruling.

The day after the guilty verdict was returned in this case, the victim's father gave an interview on local television. In that interview, Edna's father stated that an FBI agent had told him that the FBI had investigated and found no link between Edna and the defendants or the $200,000 of alleged drug money. Because this assertion ran directly contrary to the government's theory at trial and apparently contradicted the testimony of Aponte–Lazú that Edna had admitted having the money but claimed to have returned it, appellants Rosario–Díaz and Montalvo–Ortiz filed a motion for a new trial alleging Brady violations and the discovery of new evidence. All appellants joined the motion.

After receiving briefs, conducting a hearing, and reviewing the statement of Edna's father, the trial court denied the motion for a new trial on August 6, 1998.

See Opinion and Order of August 6, 1998. After examining the relevant law, the trial court determined that the agent's statement to Edna's father would be inadmissible (and in any event immaterial) lay opinion and thus was neither discoverable under Brady nor "newly discovered evidence" warranting a new trial under Federal Rule of Criminal Procedure 33. See id. at 18–21.

■ We review the denial of a motion for a new trial for abuse of discretion. See United States v. Montilla–Rivera, 115 F.3d 1060, 1064 (1st Cir.1997). We also note that a new trial is generally warranted only in the rare circumstance where retrial is necessary to prevent a miscarriage of justice. See United States v. González–González, 136 F.3d 6, 12 (1st Cir. 1998). After carefully reviewing the record and the law, we hold that the district court did not abuse its discretion in denying the motion for a new trial.

First, the agent's statement to the victim's father cannot itself warrant a new trial. Because it was made after trial, the prosecution cannot be faulted for failing to produce it as Brady material. Even if a new trial were granted, the agent's statement might very well be excluded as inadmissible hearsay or, as the district court opined, inadmissible lay opinion testimony. Moreover, even if admitted, the testimony is to a lack of evidence, not to some talismanic piece of evidence affirmatively proving or disproving a connection. Its probative value, therefore, would be questionable.

Second, we do not agree with appellants' implicit contention that the agent's statement necessarily indicates that the prosecution possessed other exculpatory evidence at the time of trial. Again, the agent's alleged statement was that the FBI had failed to establish a connection between Edna and the drug operation.

---

**2.** The district court twice instructed the jury to this effect: "I remind them that they are to take Aponte Lazú's statement under oath as to credibility and subject to the questioning of the defendants, that is the main and only testimony of Aponte Lazú." Tr. Nov. 24, 1997, at 63; see id. at 45.

We decline to speculate that the government had affirmatively disproved any connection, and we certainly should not and will not require the prosecution to report back to the defense every time an investigation fails to produce the results that the government intended.

Third, we agree with the district court that appellants' motion for a new trial failed to demonstrate a sufficient likelihood that the "evidence" derived from the statement would change the outcome of the trial. At best, the information would allow the defense to (1) impeach Aponte–Lazú's testimony that Edna had admitted having and returning the drug money and (2) dispute the alleged motive for carjacking Edna—to retrieve the $200,000. As the United States points out, Edna's connection to the defendants or to the money is not an element of any crime charged nor an alleged overt act of the conspiracy. Furthermore, whether or not Edna was in fact involved with the drug operations is ultimately irrelevant to appellants' guilt for carjacking and killing her.

Under the circumstances, we conclude that the district court did not err in denying the motion for a new trial.

### 3. *Sufficiency of the Evidence*

■ Appellants argue that the evidence submitted at trial was insufficient to sustain the jury's guilty verdicts against them, because the inculpatory evidence presented at trial consisted almost exclusively of the testimony of cooperating witness Aponte–Lazú. Appellants argue that Aponte–Lazú's testimony is unbelievable because Aponte–Lazú admitted to lying to agents and others at various times and because of Aponte–Lazú's history of criminal behavior. Again, we review a district court's Rule 29 determinations *de novo*. *See United States v. Hernández*, 146 F.3d 30, 32 (1st Cir.1998).

Appellants correctly note that we have held the uncorroborated testimony of a cooperating accomplice sufficient to sustain a conviction, unless that testimony is fa-cially incredible. *See United States v. Andújar*, 49 F.3d 16, 21 (1st Cir.1995). Aponte–Lazú's testimony in this case was not facially incredible. It is true that, given the circumstances surrounding the crimes committed, Aponte–Lazú's participation therein, and his obvious motive to testify favorably for the government, Aponte–Lazú's credibility was subject to challenge. This, however, was vigorously done by appellants at every opportunity during trial, before those charged with weighing credibility—the jury. Appellants offer us no basis for determining that the jury's credibility determination is unsupportable other than the evidence that the jury itself considered and rejected. Because Aponte–Lazú's testimony is not facially unbelievable, we hold that his testimony alone provided the jury with enough evidence to support the convictions of Meléndez–García, Báez–Jurado, and López–Morales. Furthermore, the evidence against Meléndez–García and Báez–Jurado included their own inculpatory statements to law enforcement. Consequently, we decline to reverse the convictions of Meléndez–García, Báez–Jurado, or López–Morales on sufficiency-of-the-evidence grounds.

### 4. *Improper Sentence Imposed for Conspiracy Conviction*

Next, appellants have joined the argument, best articulated in the brief of appellants Rosario–Díaz and Montalvo–Ortiz, that the district court erred in imposing life sentences for appellants' convictions on Count Two, which charged them with conspiracy in violation of 18 U.S.C. § 371. The United States concedes that 18 U.S.C. § 371 provides for imprisonment of "not more than five years." The district court clearly erred in imposing life sentences on Count Two, and we vacate the sentences of Meléndez–García, Báez–Jurado, and López–Morales on Count Two and remand for resentencing.

### 5. *Unfair Prejudice from Evidence Against Other Defendants*

 Finally, appellants jointly argue that the substantial evidence admitted against other defendants, particularly Rosario–Díaz and Montalvo–Ortiz, unfairly prejudiced them by allowing the jury to convict them on the basis of evidence relating to other defendants' conduct. In essence, appellants challenge the district court's denial of their requests for severance. We conclude that there was no reversible error.

At trial, the United States offered a great deal of testimony detailing the drug trafficking activities of defendants Rosario–Díaz and, to a lesser extent, Montalvo–Ortiz. The government did not allege nor prove that the other defendants were involved in those illegal activities. Appellants now argue that the evidence against Rosario–Díaz and Montalvo–Ortiz improperly affected the jury's verdicts, and they request that we reverse their convictions.

We have recognized this kind of "spillover" claim before. *See, e.g., United States v. Drougas,* 748 F.2d 8, 18–19 (1st Cir.1984). In *Drougas* we stated that, "[i]n a case involving several defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as a basis for convicting another defendant not connected to that evidence." *Id.* (citing *United States v. Flaherty,* 668 F.2d 566, 582 (1st Cir.1981)). After stating that the district court's severance determinations should be overturned only upon a showing of strong prejudice, *see id.,* we nevertheless concluded that the trial court's careful instructions to the jury and the ample evidence against the defendant eliminated any possibility of unfair prejudice.

We likewise conclude that the admission of the drug-related evidence in this case was not an abuse of discretion. The evidence of Rosario–Díaz's drug trafficking was clearly relevant in that it connected Rosario–Díaz to Edna, supported the government's theory on motive, and corroborated the critical testimony of Aponte–Lazú. The drug trafficking evidence can also be viewed as necessary to complete the story of the conspiracy and carjacking charged in this case, in that drugs are the common denominator linking the various characters.

Moreover, there was ample evidence admitted against each appellant to reduce the risk of an unfounded guilty verdict. As discussed above, the government presented substantial evidence of guilt, primarily through the testimony of Aponte–Lazú but also, at least in the cases of Meléndez–García and Báez–Jurado, through the appellants' own inculpatory statements to investigators. Although the record does not reflect the extensive corrective instructions given to the jury in *Drougas,* we nevertheless hold that the evidence of drug trafficking in this case did not create a sufficient risk of unfair prejudice to warrant reversal and severance.

### 6. *Meléndez–García's Waiver of Rights and Consent to Search*

 Turning now to the appellant-specific arguments raised in appellants' joint brief, we consider first the issues raised by appellant Meléndez–García. Meléndez–García first argues that her statements to the FBI and the evidence recovered in the search of her residence should have been suppressed because her waivers were not "knowing and intelligent" and because her statements and consent to search were not voluntary. After reviewing the record, we conclude that there was no error in the admission of this evidence.

 We review the district court's rulings on these issues for clear error. *See United States v. Cardoza,* 129 F.3d 6, 13 (1st Cir.1997) (Fourth Amendment challenge); *United States v. Santos,* 131 F.3d 16, 18 (1st Cir.1997) (Fifth Amendment challenge).

The question before the district court was whether the government demonstrated by a preponderance of the evidence, *see Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), that Meléndez–García's waiver and consent were both "voluntary in that [they] were the product of a free and deliberate choice rather than intimidation, coercion and deception" and also made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon," *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The court's determination must be made in light of "the totality of the circumstances and the facts surrounding the particular case including the background experience and conduct of the accused." *United States v. García*, 983 F.2d 1160, 1169 (1st Cir.1993).

Meléndez–García admits to signing a written waiver of her *Miranda* rights and a written consent to search her residence. However, she claims that the district court could not have properly found her waiver of her Fourth and Fifth Amendment rights to be knowing and intelligent and voluntary, based on the evidence that she has a very low I.Q. and that she was interviewed by law enforcement over a period of some six hours.

The trial court received a substantial amount of evidence regarding Meléndez–García's mental capacity, including expert testimony from both sides. Although the court received evidence that Meléndez–García's I.Q. was in the middle 70s and that she had no prior involvement with the criminal justice system, the court also heard testimony from an arresting officer and the government's expert witness that Meléndez–García understood what was happening when she waived her Fifth Amendment rights and consented to the search.

The district court also received evidence relating to the voluntariness of Meléndez–García's decisions. Although Meléndez–García herself testified that she felt very scared and physically ill, there was no evidence whatsoever of physical coercion or intimidation, nor was there any indication of conduct by the law enforcement agents that would amount to psychological coercion or intimidation.

Viewing the totality of the circumstances particular to this case, we cannot conclude that the district court clearly erred in its determination that Meléndez–García's waiver and consent were knowing and intelligent and made voluntarily. We therefore affirm the district court's decision on this issue.

### 7. *Denial of Downward Departure*

Appellant Meléndez–García also argues that the district court should have awarded her a downward departure under § 5K2.13 of the Sentencing Guidelines. On appeal, she suggests that the court should have taken into consideration both her diminished mental capacity and her role in caring for Edna's baby after the crime.

We first note that a district court's decision not to depart from the Sentencing Guidelines is ordinarily not appealable unless the record indicates some error of law such as a misapprehension of the applicable guideline or a miscalculation of the sentencing court's authority. *See United States v. Grandmaison*, 77 F.3d 555, 560 (1st Cir.1996). Appellant points to no such legal error in the record, arguing instead that the district court simply denied her a departure to which she was entitled. We are therefore without jurisdiction to review the district court's refusal to grant a departure.

### 8. *Voluntariness of Báez–Jurado's Statements to Investigators*

The final issue raised by appellant Báez–Jurado is a challenge to the admission into evidence of his inculpatory statements to investigators the day following his detention. Although the trial court's determination of voluntariness is

subject to *de novo* review, its factual findings are reviewed for clear error. *See United States v. Santos,* 131 F.3d 16, 18–19 (1st Cir.1997). Because we conclude that the statements were voluntary, we affirm the admission of the statements at trial.

■ Báez–Jurado's principal contention is that he was detained for twenty-eight hours before being brought before a magistrate, and that the government's proffered reasons of administrative delay and unavailability of a magistrate are not credible. However, Báez–Jurado does not point to any evidence of physical or psychological coercion by law enforcement, nor does he specify how the delay in his initial appearance rendered his confession involuntary. Furthermore, delay in appearing before a magistrate is only one of several factors to be considered in determining voluntariness. *See* 18 U.S.C. § 3501(b) (listing several illustrative and nonconclusive factors). None of the other factors suggesting involuntariness have been shown. Consequently, we find no error in the district court's determination that the statements were admissible.

### C. *López–Morales*

■ In addition to the arguments addressed above, appellant López–Morales challenges the district court's admission of two types of evidence.[3]

### 1. *Evidence of Plan to Kill Government Witnesses*

■ At trial, the government presented evidence, through the testimony of Aponte–Lazú, that Aponte–Lazú and López–Morales agreed to a plan by which Aponte–Lazú would exonerate López–Morales to the authorities so that López–Morales would be released and then murder witnesses expected to testify for the gov-

ernment. López–Morales now argues that this evidence was irrelevant, unfairly prejudicial, and that its admission implicitly amended the indictment in violation of the Grand Jury Clause of the Fifth Amendment. We generally will reverse a district court's admissibility determinations under Federal Rules of Evidence 402 and 403 only in extraordinarily compelling circumstances, *see United States v. Brandon,* 17 F.3d 409, 443 (1st Cir.1994), although we consider López–Morales's constitutional challenge *de novo.*

■ First, we find the evidence of the plot to be plainly relevant to López–Morales's guilt in the carjacking, insofar as it evinces a consciousness of guilt. *See United States v. Gonsalves,* 668 F.2d 73, 75 (1st Cir.1982). Likewise, we cannot find that the district court abused its discretion in admitting the evidence under Federal Rule of Evidence 403. Although we agree with appellant that the evidence is prejudicial to his defense in a generic sense (as is all probative evidence of guilt), we are not persuaded that it was unfairly so. The jury had every opportunity to weigh Aponte–Lazú's testimony, and, once accepted, that testimony was properly held against López–Morales.

■ López–Morales's Fifth Amendment argument is more substantial. As we recognized in *United States v. Dunn,* 758 F.2d 30, 35 (1st Cir.1985), the admission of evidence of an offense not charged in the indictment can, in some circumstances, constitute grounds for reversal of a conviction. *See also Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). The Grand Jury Clause of the Fifth Amendment guarantees that no person shall be tried and convicted of a crime in federal court lest his fellow citizens have seen fit to charge him with such crime. If the court permits

---

**3.** Appellant López–Morales noted in his brief that he intended to preserve a claim that the district court erred in denying his motion for a judgment of acquittal made pursuant to Federal Rule of Criminal Procedure 29. Ap-

pellant has not briefed this issue, however, and has failed to request an extension of time to do so. We therefore are forced to consider this claim waived.

the jury to convict a defendant on evidence of a crime not included in the indictment, that constitutional right is violated. *See id.* at 216–18, 80 S.Ct. at 273 (quoting *Ex parte Bain,* 121 U.S. 1, 10, 7 S.Ct. 781, 30 L.Ed. 849 (1887)).

This important rule, however, is not as broad as appellant would have us proclaim. Although an indictment may not be constructively amended by presenting evidence of uncharged offenses, there are many instances in which evidence of uncharged conduct is properly admitted in a criminal trial. Rule 404(b) of the Federal Rules of Evidence, for instance, states that evidence of uncharged crimes, wrongs, or acts may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge," etc. Such evidence, because ultimately offered to prove guilt of the charged offense, effects no constructive amendment of the indictment and therefore does not infringe on a defendant's Fifth Amendment rights. Likewise, in this case the United States offered evidence of the plan to kill government witnesses for a number of legitimate reasons aimed ultimately at proving the charged offenses, including to prove consciousness of guilt and to explain the inconsistency between Aponte–Lazú's initial exoneration of López–Morales and his subsequent change in testimony. We find no constructive amendment of the indictment and no reversible error.

### 2. *Evidence of Rape*

The United States also presented the jury with evidence that López–Morales participated in the rape of Edna before she was murdered. López–Morales argues that this evidence should have been excluded as irrelevant or, at least, as unfairly prejudicial, because rape was not an element of the offense charged—carjacking that resulted in death, under 18 U.S.C. § 2119(3). Again, we reverse a district court's Rule 402 and 403 determinations only rarely and only upon demonstration of extraordinary circumstances. *See Brandon,* 17 F.3d at 443.

The trial judge did not abuse his discretion in admitting the evidence of rape in this case. There can be no reasonable dispute that the rape evidence was inseparably intertwined with the carjacking and murder, and the evidence presented to the jury was necessary to complete the story of the crime charged in the indictment, even though that indictment charged appellant with a carjacking that resulted in death rather than the lesser crime of a carjacking resulting in bodily injury. Although the evidence was certainly powerful, there was no error in the trial judge's determination that its probative value was not substantially outweighed by any possibility of unfair prejudice. *Cf.* Fed.R.Evid. 403.

### III. CONCLUSION

In conclusion, the convictions of appellants Rosario–Díaz and Montalvo–Ortiz must be reversed for insufficiency of evidence. The convictions of appellants Meléndez–García, Báez–Jurado, and López–Morales are affirmed, although we must vacate their sentences on Count Two of the indictment and remand to the district court for resentencing.

**Affirmed in part, reversed in part.**